**James R. JINKINS, Amarala Petroleum, Inc. and Damson Oil Corporation, Appellants,**

**v.**

**Harry E. BRYAN, Bryan Exploration Company, et al., Appellees.**

**No. 07–87–0084–CV.**

Court of Appeals of Texas, Amarillo.

Dec. 28, 1988.

Rehearing Denied Jan. 24, 1989.

See also, Tex.App., 733 S.W.2d 268.

Templeton & Garner, Robert E. Garner and Robert L. Templeton, Amarillo, K.B. Battaglini, Houston, for appellants.

Jess C. Dickie, Amarillo, for appellees.

Before REYNOLDS, C.J., and DODSON and BOYD, JJ.

BOYD, Justice.

Appellants James R. Jinkins, Amarala Petroleum, Inc. and Damson Oil Corporation (successor in interest to Dorchester Gas Producing Co.) bring this appeal from a take-nothing summary judgment in favor of appellees Harry E. Bryan, Bryan Exploration Company, Craig Bryan, Bryan Energy Company, Lynn Bryan and Mulberry Producing Corporation. They also appeal from an order severing a counterclaim of appellees against appellants. In their suit, appellants alleged appellees were producing "dry gas" belonging to appellants from the Southeast one-quarter of Section 44, Block 7, I & GNRR Co. Survey, in Carson County and marketing it as casinghead gas, which would be the property of appellees. Appellants sought recovery for the gas allegedly converted, to have their title to the gas quieted, and injunctive relief pending final disposition of the suit. In response, appellees filed a counterclaim in which they sought recovery for royalties previously paid on gas which, they alleged, had been determined not to be "dry gas" on which royalties would have been due to appellants. It is this counterclaim which was severed by the trial court. We reverse and remand.

Appellants attack the judgment in three points. In their first point, they say the trial court erred in its judgment because (1) there is a factual dispute as to whether or not some of the gas in question is dry gas; (2) as a matter of law, all of the gas is not casinghead gas; and (3) all of the gas above the oil and gas contact zone in an associated reservoir is, as a matter of law, dry gas. In their second point, appellants argue the court erred in not granting a continuance to permit them to obtain affi-

davits and complete allowable discovery. In their third point, appellants contend the trial court violated Texas Rule of Civil Procedure 41 by severing the counterclaim, because the issues in the case in chief and the counterclaim are identical and arise out of the same facts and acts of the parties so that the severance creates a multiplying of lawsuits and an unreasonable burden and expense on the parties.

Because this is an appeal from a summary judgment, the issues before us must be resolved within the framework of settled principles of summary judgment law. A movant is entitled to a summary judgment when the movant establishes (1) the absence of genuine issues of material fact and (2) the right to judgment under those undisputed material facts, as a matter of law, on grounds expressly stated in the motion. *Delgado v. Burns*, 656 S.W.2d 428, 429 (Tex.1983); *Whiddon v. Metni*, 650 S.W.2d 904, 905 (Tex.App.—Dallas 1983, writ ref'd n.r.e.); Tex.R.Civ.P. 166a(c). The movant, against whom all doubts are resolved, has the burden of establishing both elements, *City of Houston v. Clear Creek Basin Authority*, 589 S.W.2d 671, 678 (Tex.1979), and when the defendant is the movant, summary judgment is proper only if the plaintiff cannot, as a matter of law, succeed upon any theory pled by the plaintiff, *Gibbs v. General Motors Corporation*, 450 S.W.2d 827, 828 (Tex.1970), or by conclusively establishing every factual element of an affirmative defense. *Swilley v. Hughes*, 488 S.W.2d 64, 67 (Tex.1972).

Conversely, the plaintiff can bar the defendant's entitlement to a summary judgment by responding with evidence that creates a fact question on those elements of the plaintiff's case under attack by the defendant or on at least one element of each affirmative defense advanced by the defendant. *Torres v. Western Casualty & Surety Company*, 457 S.W.2d 50, 52 (Tex. 1970); *see also Puga v. Donna Fruit Co., Inc.*, 634 S.W.2d 677, 680–81 (Tex.1982). The evidence must be viewed in a light most favorable to the non-movant, conflicts in the evidence are ignored, and the evidence which tends to support the position of the non-movant is accepted as true. *Great American R. Ins. Co. v. San Antonio Pl. Sup. Co.*, 391 S.W.2d 41, 47 (Tex. 1965); *Borg–Warner Acceptance Corp. v. C.I.T. Corp.*, 679 S.W.2d 140, 142 (Tex.App. —Amarillo 1984, writ ref'd n.r.e.).

In their motion for summary judgment, appellees alleged that appellants James R. Jinkins and Amarala Petroleum, Inc. were the owners of an undivided one-sixth interest, and appellant Damson Oil Corporation was the owner of a one-sixteenth interest, in the dry gas, only, under the tract of land here in question. They further asserted that "dry gas" is defined in the Texas Natural Resources Code Annotated section 86.002(7) (Vernon 1978) as "gas produced from a stratum that does not produce oil." Additionally, they postulated that the summary judgment proof in this cause established as a matter of law that oil was being produced from the Brown Dolomite formation, the formation from which the alleged converted gas was being produced, within the purview of the statute. Moreover, they continued, that formation was the "stratum" referred to in the statute. Bottomed on these premises, they then concluded that the gas which was, and had been produced from the tract, was not dry gas, and they were, therefore, entitled to their take-nothing summary judgment. It is our task to assess the summary judgment evidence to determine if it does indeed sustain those allegations. This requires a review of that evidence.

It is undisputed that there are four well bores located on this quarter section. These bores are known as the Herber No. 1 Oil Well (Herber No. 1), the Herber No. 3 Oil Well (Herber No. 3), the Herber No. 5 Oil Well (Herber No. 5) and the Herber No. 1 Gas Well. The Herber No. 1 is located in approximately the northeast corner of the quarter, with the Herber No. 3, the Herber No. 5 and the Herber No. 1 Gas Well located below it in a southerly direction. The Herber No. 1 Gas Well is located in approximately the southeast corner of the quarter.

It is also undisputed that on June 22 and August 25 and 28, in 1978, appellee Harry Eugene Bryan (Bryan) obtained four separate oil and gas leases covering the subject quarter section (the Herber lease) from the Herber family members. At that time, the oil and casinghead gas rights were owned by the Ladd Petroleum Company and held by virtue of production from the Herber No. 1. On March 29, 1982, Bryan assigned to appellant James R. Jinkins a ⅙ interest in the 81.25 percent working interest in the Herber lease "only insofar as said leases cover the dry gas rights thereunder." Previously, on November 9, 1979, Bryan had assigned to Dorchester Gas Producing Company an overriding royalty interest of ¹⁄₁₆ of ⅜ of the dry gas rights under the Herber lease. Appellant Damson Oil Corporation's rights derive from this instrument.

Additionally, it is undisputed that in May of 1982, the Herber No. 1 Gas Well was completed solely in the Brown Dolomite formation. The total depth of this well is 3018 feet, with the producing perforated interval from a depth of 2772 feet to 2946 feet. The bottom sixty feet of that well is not perforated. This well has produced only gas since its completion. A formation known as the Granite Wash formation is located below the Brown Dolomite formation. The Herber No. 1 had been drilled into the Granite Wash formation. The Herber No. 3 and 5 wells were drilled in October and November of 1983 and were also drilled into the Granite Wash formation and, originally, perforations in these wells were made only in the Granite Wash formation. It is also undisputed that no attempt has been made by appellees to determine any "oil and gas contact point" in the Brown Dolomite formation.

In Bryan's supporting summary judgment testimony he said that on December 15, 1982, he obtained an assignment from the Ladd Petroleum Company covering all the oil and casinghead gas rights to this quarter, together with a bill of sale to the Herber No. 1. He then set a plug in the well at the very bottom of the Brown Dolomite formation. This, he said, left about twenty feet of arkosic shale and dolomite between the Brown Dolomite and Granite Wash formations "so that no communication outside the casing should occur." Moreover, said he, the bottom perforation in the Brown Dolomite was made some seventy feet above the plug at the base of that formation, thus leaving some ninety feet of "tight dolomite and impervious shales." This was done with the avowed intent to insure that no outside communication between the two formations would occur.

The Herber No. 1 was then perforated in the Brown Dolomite with 80 holes between the depths of 2808 and 2943 feet. Bryan then drilled out the plug which had been placed at the bottom of the Brown Dolomite formation in the well and knocked it down on top of a new plug that had been set at the very bottom of the casing, cleaned and returned the tubing to the well, and placed it back into production. He averred that the well was pumped for a three-month period prior to workover and for a comparable three-month period after the workover, with the exception of a two-week period in December 1983 and another two-week period in January, 1984, when periods of sub-zero temperatures caused the wells and flow lines in the area to freeze. His pumper's gauge reports, he declared, show that oil production from the well increased by over 200 percent after the workover.

After the workover, Bryan filed for permits for an additional four wells, being well numbers 3, 4, 5 and 6. Well numbers 4 and 6 were never drilled. Completion work was then started on both the Herber No. 3 and the Herber No. 5 on December 8, 1983. He declared the logs of both these wells were almost identical, with both wells having the same tops and bottoms of the two formations. The Granite Wash formation was only perforated in the No. 3 well.

On December 8, 1983, Bryan perforated the Granite Wash zone in the No. 5 well. After acidizing those perforations, he set a bridge plug at a depth of 3000 feet which, he said, was the bottom of the Brown Dolomite, and perforated all except the bottom 57 feet of that formation. The Brown

Dolomite, he asserted, was isolated from the Granite Wash within the casing by the plug set at 3000 feet and outside the casing by 57 feet of tight Brown Dolomite and about 40 feet of arkosic dolomite, shale and upper Granite Wash, for a total of 97 feet of separation outside the casing.

Four days later, on December 12, 1983, in the No. 5 well, he perforated the Brown Dolomite with 78 holes over an interval from 2786 feet to 2940 feet, the perforations were acidized and the Brown Dolomite "fraced." According to Bryan, the plug withstood a frac pressure of about 1400 pounds per square inch during the fracing process so he decided to drill it out. However, the drilling out of the plug with a cable tool rig was delayed by bad weather until January 11, 1984, when a cable tool rig belonging to the Copan Drilling Company was moved in.

On January 11, Bryan continued, Troy Wilkinson, Copan's driller, called Bryan's office and reported that when the drilling crew opened the well to bleed down its pressure in order to drill out the plug, the well started blowing oil. The following morning, January 12, 1984, 150 barrels of salt water were injected in the well to "kill" the well. Although Wilkinson began drilling out the plug, he was not able to remove it.

They returned the next day, January 13, 1984, Bryan averred, opened the well for work and it "blew oil out again." Another 150 barrels of salt water were injected to kill the well a second time, whereupon Wilkinson was able to knock out the plug and push its remains to the bottom, which, he said "commingled the Brown Dolomite and Granite Wash perforations." Wilkinson then, averred Bryan, began running the tubing, rods, and pump, at which time the "oil and gas were beginning to blow out again in increasing quantities." Someone, he continued, lit a cigarette out of habit, the well ignited, and "burning oil and gas started blowing over the rig" requiring the fire to be extinguished and the well shut in. However, on January 16, 1984, the Herber No. 5 was made ready for production awaiting flow lines.

On March 2, 1984, a Railroad Commission initial potential test was run on the Herber No. 3. It produced 16 barrels of oil during the 24–hour test period out of the Granite Wash perforations only, since the Brown Dolomite had not yet been perforated. On March 15, 1984, a similar test was run on the Herber No. 5. It produced 86 barrels of oil during the 24–hour test period from both the Granite Wash and the Brown Dolomite perforations.

On October 1, 1984, Bryan declared, he went back into the Herber No. 3 to isolate and test the Brown Dolomite for oil production. A plug was set at 3000 feet at the base of the Brown Dolomite. The Brown Dolomite and Granite Wash formations were separated outside the casing by about 90 feet of tight dolomite and impervious shale and inside the casing by the plug set at 3000 feet, he stated. The Brown Dolomite was then perforated with 78 holes over an interval of 2780 feet to 2936 feet, acidized, fraced and the plug drilled out. Prior to opening the Brown Dolomite in the Herber No. 3, he asseverated, the highest daily rate it ever attained was sixteen barrels on the initial potential test. It now, he declared, was the best well on the lease, producing up to twenty-seven barrels of oil per day.

After the filing of this suit, Bryan continued, he decided to ascertain if there was oil present in the Herber No. 1 Gas Well. The depth of this well, he said, is 3018 feet, with the producing perforated interval from a depth of 2772 to 2946 feet and the bottom 60 feet of the Brown Dolomite not being perforated. On August 11, 1986, he had the B & C Well Service, under his direction and control, open the well and lower a bailer to total depth. A sample of the well fluid in the bore hole was bailed to the surface. He averred that they found about forty feet of fluid in the well with crude oil floating on top of the total fluid column. The exact quantity of oil to salt water ratio was not determinable. He took a sample to a laboratory in Pampa for testing and, he says, "[t]heir report confirmed that crude oil was indeed present in the gas well." It was his opinion that the

bottom thirty-one percent of the Brown Dolomite in this well, which had never been saturated, was "probably saturated with producible crude oil."

Troy Wilkinson, a driller, testified by deposition that he went to the Herber No. 5 to drill the bridge plug out. He said that when he was bleeding the pressure off the well, it blew for a little while and then started blowing oil out of the hole. He stated that "it was blowing it pretty high; I don't know exactly how high, but high enough to get it all over the field and that's when I shut it in." When he returned the next day, he opened the valve to blow it down again, and it blew for just a fraction of a minute and started blowing oil out of it again. A pump truck was then ordered and 150 barrels of salt water were pumped into the well to kill it.

In opposition, appellant Jinkins testified that he had observed closely the drilling and completion of the Herber No. 1 Gas Well. It was, he said, completed in the "upper portion of the Brown Dolomite formation in May 1982." Since that time "[n]ot a single barrel of oil" had been produced or marketed from said well; it had been producing gas ever since, and had produced in excess of $990,000 worth of gas. Moreover, Jinkins said, the well was not capable of producing oil in commercial quantities out of the zones in which it was presently perforated, and he additionally asserted that the well was not capable of producing oil in commercial quantities, "period." He concluded that the three oil wells located upon the subject tract were producing dry gas "above the oil and gas contact," for which he was entitled to be paid.

John Louis Dannelley, by affidavit, stated qualifications sufficient to establish his standing as an expert witness, and said he was presently employed by the Damson Oil Corporation. He had examined the well logs and drilling reports of all of the wells operated by Bryan upon the tract upon which the Herber No. 1 Gas Well is located. That well had never produced any oil and, in his opinion, was not capable of producing oil in commercial quantities at the depth to which it was perforated. He also averred that the oil wells located upon the instant tract were perforated in part above the static level of oil and, consequently, above the "gas oil contact." His further conclusion was that in some portions of tracts adjacent to this one, the Brown Dolomite formation in the lower portions does contain some crude petroleum, but it was his belief that in this quarter section, there was not "sufficient saturation for oil to be produced within the Brown Dolomote [sic] through the perforations as they presently exist." It also was his opinion that the test upon the Herber No. 1 Oil Well before and after the Brown Dolomite and Granite Wash were commingled was not sufficient to conclude that oil production existed in the Brown Dolomite since, in his opinion, the increase in oil production came from the Granite Wash formation.

Dannelley also opined that the Herber No. 5 and its oil show did not show "clearly and convincingly" that the Brown Dolomite is producing oil because the Granite Wash was not initially tested by itself. The information he obtained, he said, shows that the Brown Dolomite's lowest perforation was 372 feet above sea level and, he believed, and stated as a fact, that "you will not find oil above that level on the section in question." It was his conclusion that 372 feet "seems" to be the highest point at which oil could be found in the Brown Dolomite under the land here in question. He also stated the Herber No. 3 Oil Well is 371 feet above sea level and opined that no oil would be produced above that level out of the Brown Dolomite.

He also referred to Bryan's testimony that the Herber No. 1 well, upon baling, showed an accumulation of fluid over more than a four-year period of time. The lab tests, he averred, set out a semi-solid matter of nine milliliters. He said this was approximately two teaspoons of oil and does not constitute oil in commercial quantities and concluded that Bryan's test convinced him "that the Brown Dolomite out of the Herber No. 1 Gas Well is certainly not producing anything except dry gas."

Dannelley also opined and stated "as a fact" that the Brown Dolomite was undoubtedly saturated with oil in its lower portions, but that saturation "is so slight and narrow and of such density and porosity that with the present drive and without secondary or tertiary recovery, no oil is capable of being produced in commercial quantities." He further concluded that "no oil" can be produced at an elevation 375 feet above sea level on this land and, in all probability, no oil can in fact be produced above 325 feet above sea level. Therefore, he reasoned, all gas produced above the levels mentioned and out of the bore holes in question is dry gas. He further avowed that "a large portion" of the gas being produced out of the "alleged" oil wells on the tract is in fact dry gas, and that all of the gas that had been produced out of the Herber No. 1 well is dry gas. He posited, therefore, that gas coming from the Brown Dolomite is not indigenous to oil and "is not being produced from such oil with the oil."

The assignment from Bryan to Dorchester (now Damson) unambiguously was of an overriding royalty of ⅟₁₆ of ⅝ (all) of the proceeds derived by the assignor from the sale of all dry gas produced from any gas well or wells drilled by assignor on the instant tract. The assignment from Bryan to Jinkins is also unambiguous. It covers an undivided ⅙ of assignor's undivided .812500 working interest in the instant tract in the assignor's dry gas rights. At the time each assignment was made, the parties knew that production from the property would be subject to the statutory definitions of oil and gas and other related matters.

In that regard, it is well settled that "[t]he laws which subsist at the time and place of the making of the contract and where it is to be performed ... enter into and form a part of it, as if they were expressly referred to, or incorporated in its terms. (citations omitted)" *Stanolind Oil & Gas Co. v. Terrell*, 183 S.W.2d 743, 744 (Tex.Civ.App.—Galveston 1944, writ ref'd). *See also Winder Bros. v. Sterling*, 12 S.W. 2d 127, 128 (Tex.Comm'n App.1929, judgment adopted); *Kerr v. Galloway*, 94 Tex.

641, 64 S.W. 858, 860 (1901); *Smith v. Elliott & Deats*, 39 Tex. 201, 212 (1873). As noted above, the statutory definition of "dry gas" is that it means "gas produced from a stratum that does not produce oil." Tex.Nat.Res.Code Ann. § 86.002(7) (Vernon 1978). This, then, is the mineral interest covered by the assignments and conveyed to appellants. As is apparent, the core issue in this appeal is whether the evidence produced, under the stringent summary judgment tests, is sufficient to establish that gas being produced from this tract is not dry gas within the purview of the statute.

Reiterated, and succinctly stated, it is the position of appellees that the portion of the statute defining dry gas must be given a strict and literal interpretation and, in the words of appellees' counsel, "if oil is present in the Brown Dolomite formation under the Herber lease (the tract in question), then the gas produced from that lease is not dry gas as defined by law." Contrariwise, appellants contend that the evidence is not sufficient to meet the summary judgment tests and to establish that oil is being produced from the Brown Dolomite within the statutory purview. Furthermore, they say, even if the summary judgment evidence shows that oil is being produced from within the Brown Dolomite, that, in and of itself, is not sufficient. This follows, they reason, because the term "stratum" as used in the statute is not synonymous with, nor would it necessarily include, the entire Brown Dolomite formation. This is so, they argue, because there is an "oil and gas contact point" within that formation above which is located "dry gas" within the statutory purview. Therefore, they continue, the term "stratum" as used in the statute, would not include the entire Brown Dolomite formation but only those portions of the formation below the oil and gas contact point and in which oil is being produced.

■ In our interpretation and construction of the statutory definitions we must be guided by the admonitions contained in Chapter 311 of the Texas Government Code Annotated (Vernon 1988) (the Code Con-

struction Act). Section 311.021 instructs us that it is to be presumed that an entire statute is intended to be construed in accordance with the presumption that the entire definitional portion of the statute is intended to be effective; the intent of the legislature must be determined by considering all of the relevant statutory definitions.

Examination of section 86.002 of the Texas Natural Resources Code Annotated (Vernon 1978) in its entirety, and in particular subsections 5, 6, and 7, makes it apparent that by legislative definition, in this state there are only two generic types of natural gas, *i.e.*, "dry gas" and "casinghead gas." The definitions of these two types must be considered together and, if possible, harmonized. Construed in that manner, we conclude that it was the legislative intent that "dry gas" would include all gas which is not indigenous to an oil stratum and produced from that stratum with oil. A "stratum" which is producing oil within the purview of section 86.002(7) is a producing horizon producing more than one barrel of oil to each 100,000 cubic feet of gas. Gas produced from such a horizon would be "casinghead gas" within the statutory purview. Contrariwise, gas produced from a horizon producing less than one barrel of oil to each 100,000 cubic feet of gas would be "dry gas."

Implicit in this construction is our holding that there can be separate producing horizons within a formation such as the Brown Dolomite. Moreover, to decide the classification of gas produced from a well, a determination must be made as to what producing horizon that gas is being drawn from, and the amount of oil relative to the amount of gas being produced from that horizon. This is a result appellee vigorously opposes, but it is one required by the statute. Moreover, it is a construction, we think, which is consistent with that adopted by our Supreme Court in *Bolton v. Coats*, 533 S.W.2d 914, 917 (Tex.1975), in which the Court noted that "[a]rticle 6008 [the precursor of section 86.002] recognizes the possibility of a gas well and an oil well producing from different horizons of the same sand at different subsurface locations."

To apply the mechanistic interpretation urged by appellees would, we believe, result in obvious injustices. Carried to its logical conclusion, that interpretation would require the reclassification of gas produced from wells on a tract which had produced nothing but dry gas for years, if upon that same tract and same formation, as a result of drilling an additional well, or as a result of additional perforations at a different level, any amount of oil, however minute, was found. Indeed, that would be the case with the Herber No. 1 Gas Well upon the instant tract. The injustice of such a holding and its unsettling effect upon previously accepted and apparently established mineral ownership interests is obvious. Moreover, such an interpretation would effectively negate that portion of the statute which defines and differentiates between an "oil well" and a "gas well" by measuring the amount of oil produced vis-a-vis the amount of gas produced from the horizons.

In summary, and in view of our holding, the evidence in the case does not establish as a matter of law the proposition espoused by appellees. We must, therefore, sustain that portion of appellants' first point of error insofar as it asserts that there is a factual dispute as to whether the gas in question was "dry gas." That sustention obviates the necessity for discussion of appellants' second point.

In appellants' third point, they challenge the action of the trial court in severing appellees' counterclaim and cross-action for royalties previously paid for "dry gas" which, they urge, was not "dry gas" and to which appellants were not entitled. That question is so inexorably intertwined and intermixed with the issues in the suit proper as to require us to sustain appellants' third point. *See Duke v. Merkin*, 599 S.W.2d 877, 880 (Tex.Civ.App.—El Paso 1980, no writ).

In summary, that portion of appellants' first point of error insofar as it asserts that there is a factual dispute as to whether the gas in question was "dry gas" is sustained

as is their third point. The judgment of the trial court is reversed and the cause is remanded for trial on its merits.