**RAW HIDE OIL & GAS, INC., Raw Hide Production Company, Inc., & J.C. McCollough, Appellants,**

v.

**MAXUS EXPLORATION COMPANY.**

No. 07–88–0011–CV.

Court of Appeals of Texas, Amarillo.

Dec. 31, 1988.

Rehearing Denied Feb. 15, 1989.

J.R. Lovell, Cynthia A. Quetsch, Lovell & Lyle, Dumas, Parker McCollough, George-town, for appellants.

Frank Douglass, Tom W. Reavley, Ray Donley, Scott, Douglas & Luton, Harlow Sprouse, Underwood, Wilson, Berry, Stein & Johnson, Austin, for appellee.

Before REYNOLDS, C.J., and DODSON and PIRTLE, JJ.

PIRTLE, Justice.

This action involves a title and ownership dispute between the gas rights owner and the oil and casinghead gas rights owner, under two separate mineral leases on a tract of land situated in Moore County, Texas. Throughout this opinion, gas belonging to the owner of the gas rights will be referred to as "gas rights gas," whereas gas belonging to the owner of the oil and casinghead gas rights will be referred to simply as "casinghead gas."

Diamond Shamrock Exploration Company, now known as Maxus Exploration Company (both generally referred to as Maxus), the gas rights owner, brought suit against Raw Hide Oil & Gas, Inc. (Raw Hide Oil) and J.C. McCollough (McCollough), the oil and casinghead gas rights owner, seeking damages for conversion of gas belonging to Maxus and declaratory relief to determine its ownership rights in future production from certain formations under that tract of land. Raw Hide Production Company, Inc. (Raw Hide Production) intervened in the suit, alleging that it owned an interest in the oil and casinghead gas rights. Raw Hide Oil, Raw Hide Production and McCollough (collectively referred to as Raw Hide) counterclaimed, seeking a declaratory judgment that Maxus had converted oil and casinghead gas, alleging that Maxus had failed to case off, save and protect their oil and casinghead gas rights. A pretrial court order provided for supervised testing of the wells at issue. Proceeds from the sale of gas produced during the test period were deposited into the registry of the court pending determination of ownership.

Raw Hide appeals from an adverse judgment, rendered upon a jury verdict favorable to Maxus. The judgment provides, *inter alia*, that Maxus owns the exclusive right to complete and produce wells in certain formations, productive of gas rights gas only, and that certain Raw Hide wells were producing gas which belonged to Maxus. The judgment permanently enjoined Raw Hide from producing gas from certain formations under the lease and awarded Maxus damages and attorney's fees.

By eleven points of error, with corresponding numbers, Raw Hide contends that the trial court erred in (1) awarding attorney's fees to Maxus; (2) submitting an

improper definition of the term "oil" following special issue number seven; (3) placing the burden of proof in special issue number three on Raw Hide; (4) rendering judgment, claiming that there is no evidence to support the answer to special issue number three or, in the alternative, that said answer is against the great weight and preponderance of the evidence; (5) awarding the funds in the court's registry to Maxus; (6) refusing to submit Raw Hide's requested special issue numbers one and two, claiming that there was sufficient evidence to support their submission; (7) refusing to submit Raw Hide's requested special issue numbers three, four, five, and six, claiming that there was sufficient evidence to support their submission; (8) excluding evidence pertaining to the Powell "C" lease; (9) rendering judgment, claiming that there is no evidence to support the answer to special issue number seven or, in the alternative, that said answer is against the great weight and preponderance of the evidence; (10) excluding defense exhibit number seventy-two; and (11) declaring that certain formations under Section 237 are gas zones and not productive of oil. We affirm the judgment of the trial court for the reasons now to be stated.

### Overview of the Facts

A brief review of the facts is essential. In 1938, The Shamrock Oil and Gas Corporation (Shamrock) and W. Coffee entered into a gas mining lease (the 1938 Coffee lease). This lease conveyed to Shamrock the exclusive right to prospect for, drill, and produce "gas" on Section 237, Block 3–T, T & NO Ry. Co. Survey, Moore County, Texas. The 1938 Coffee lease specifically excluded "all of the oil and casinghead gas (as casinghead gas is defined by existing law)." Paragraph 12 of the 1938 Coffee lease provides:

12. If at any time the holder and owner of the gas and gas rights granted under the terms of this lease shall, in the drilling on said premises for gas, encounter oil in any well to be drilled under the terms hereof, then the lessee herein shall use reasonable care and caution to case off any such oil and/or casinghead gas that may be encountered therein, and likewise if at any time hereafter during the existence of this lease the holder and owner of the oil and oil rights in and to said premises shall, in the drilling for and the production of oil and casinghead gas thereon, encounter gas in any well or wells being so drilled, then such person shall use reasonable care and caution to case off, save and protect any such gas so encountered, it being the intention hereof that the holder and owner of the gas and gas rights, and the holder and owner of the oil and casinghead gas and rights therein in and to said premises, shall each use reasonable care and caution in the production of such respective products as will save and protect the product of the other from waste.

By assignment, Maxus holds current title to the gas rights originally conveyed to Shamrock under the 1938 Coffee lease.

There are five geological formations, relevant to this dispute, located under the tract covered by the 1938 Coffee lease. From top to bottom, they are the Red Cave, Brown Dolomite, White Dolomite, Moore County Lime, and Arkosic Dolomite formations.[1]

In 1938, Shamrock drilled the Coffee H–1 well on the lease. This well was completed throughout the Brown Dolomite and Moore County Lime formations. Since completed, the Coffee H–1 well has continuously produced gas, except during times when it was shutin or being reworked. The Coffee H–1 produced approximately 23.1 BCF (billion cubic feet) of gas and no oil from 1938 to June 1987, the latest reporting period prior to trial.

On May 25, 1981, Wayne Jones obtained an oil and casinghead gas lease from several parties covering all but 80 acres of section 237 (the Fate lease). Jones subsequently assigned the Fate lease to Flatiron Corporation. On November 25, 1983, Raw Hide Oil entered into a farmout agreement

---

**1.** Raw Hide disputes the existence of the Arkosic Dolomite formation under Section 237; however, resolution of this issue is not germane to this Court's decision.

with Flatiron in which Raw Hide Oil agreed to drill two wells, with the option of drilling ten additional wells, on the E/2 of Section 237, in exchange for an assignment of Flatiron's oil and casinghead gas rights on 20 acres surrounding each well drilled. Flatiron retained an overriding royalty and an optional participating working interest in the wells drilled. Raw Hide Oil subsequently became the owner of all oil and casinghead gas rights under the Fate lease, and on March 21, 1984, Raw Hide assigned an overriding royalty to McCollough.

Raw Hide Production drilled the Raw Hide Fate well Nos. 9, 10, 11, and 12 on the lease in June and July 1984. Richard Strickland, a petroleum engineer, reported that many of the perforations in these wells were completed in the Brown Dolomite and Moore County Lime formations, the same formations from which the Coffee H–1 well has produced gas since 1938.

In April 1985, after the instant lawsuit was commenced, Raw Hide Production completed the Raw Hide Fate well Nos. 3, 7, and 8. The Raw Hide Fate well No. 3 also has perforations within the same formation from which the Coffee H–1 well is producing. Strickland reported that the Raw Hide Fate well No. 8 has no perforations in the Moore County Lime, but has some perforations in the Arkosic Dolomite. The top perforations in the Arkosic Dolomite are only a few feet from the bottom of the Moore County Lime. There was evidence that the Fate well No. 8 was completed and fracture treated in a manner that would indicate a possibility that the well was capable of producing gas from the Moore County Lime as well as the Arkosic Dolomite. The Fate well No. 7 was drilled through the Moore County Lime and a few feet into the Arkosic Dolomite; however, it was filled with cement up to a point in the Red Cave formation.

In May 1985, Raw Hide Production completed the Raw Hide Fate well Nos. 4, 5, and 6. Although these wells were perforated only in the Arkosic Dolomite, the top perforations were only a few feet from the bottom of the Moore County Lime. Strickland stated that these wells were also frac-

ture treated in a way that could result in gas being produced from the Moore County Lime.

On November 14, 1985, the parties entered into an agreed testing order. The order provided that Raw Hide would operate the wells during the testing period. Maxus was permitted to run logs, conduct bottom hole pressure and temperature surveys, and install temporary gas flow lines from the wells to transport the gas produced. Proceeds from the sale of gas produced during the test period were to be deposited into the registry of the court, pending distribution upon determination of the merits of the case.

The initial phase of agreed testing commenced on January 2, 1986, but was prematurely terminated by Raw Hide on January 28, 1986. The second five day preflow testing phase never started because Raw Hide shut in all of its wells. From January 3rd to the 24th, all ten Raw Hide Fate wells were in operation. On the 25th and 26th only four wells were producing. On the 27th and 28th, only two wells were producing. The average barrels of oil produced per well per day during the test period was 0.049, with an average daily value of $0.93. The wells produced an average of 225 MCF of gas per well per day, with an average daily value of $562.50. During the last nine days of the test, no oil was produced from any well. There were seven other days when no oil was produced from any of the Raw Hide Fate wells. Raw Hide disputed the test results by producing evidence that the gathering system, designed and installed by Maxus and used to collect the substances produced from the well during the test, prevented oil production from the wells.

In response to special issues, with corresponding numbers, the jury found that: (1) the Raw Hide Fate wells were capable of producing gas rights gas from the Red Cave, Brown Dolomite, White Dolomite, and Moore County Lime formations; (2) the Raw Hide Fate wells produced some gas rights gas; (3) the Raw Hide Fate wells had produced 100% gas rights gas and no

casinghead gas during the court-ordered test period; (4) Raw Hide vented 2,623.86 MCF of gas rights gas from its Fate wells prior to the court-ordered test; (5) the fair market value of the gas rights gas vented prior to the court-ordered test was $5,247.72; (6) Maxus had peaceable and adverse possession of the leasehold right to produce natural gas from the Dolomite and Moore County Lime formations above 347 feet above sea level for at least the ten consecutive years prior to June 1, 1986; (7) no oil exists in the Red Cave, Brown Dolomite, White Dolomite and Moore County Lime formations under the Raw Hide Fate Lease; and (8) subsequent to June 1984, Maxus did not convert any oil or casinghead gas on the E/2 of Section 237, owned by Raw Hide Production or McCollough.

In accordance with the jury verdict, the trial court entered judgment and decreed that: (1) pursuant to the Uniform Declaratory Judgments Act,[2] Maxus owned the exclusive and sole right to complete wells in and produce gas from the Red Cave, Brown Dolomite, White Dolomite, and Moore County Lime formations under the lease, since these formations were gas zones and not productive of oil; (2) pursuant to the Uniform Declaratory Judgments Act, the gas produced by Raw Hide Production from the Fate lease was gas owned by Maxus and that all funds in the registry of the court pursuant to the court-ordered tests were the property of Maxus; (3) Raw Hide Oil and Raw Hide Production were permanently enjoined from producing gas from the Raw Hide Fate lease in the Red Cave, Brown Dolomite, White Dolomite, and Moore County Lime formations; (4) all funds in the registry of the court were to be distributed to Maxus; (5) Maxus shall recover from Raw Hide Production $5,247.72 in damages; (6) Raw Hide shall take nothing on its counterclaim against Maxus; (7) Maxus shall recover from Raw Hide Oil and Raw Hide Production jointly and severally, the sum of $196,875 in attorney's fees; (8) Maxus shall recover from

Raw Hide, jointly and severally, the sum of $3,125 in attorney's fees; (9) Maxus shall recover an additional $37,500 from the parties taking an appeal to the court of appeals; (10) Maxus shall recover an additional $17,500 from the parties filing an application for writ of error to the Texas Supreme Court; and (11) Maxus shall recover costs and interest from the date of judgment as provided by statute.

### Merits of the Appeal

We will first discuss Raw Hide's eleventh point of error because that point presents a jurisdictional attack. Raw Hide contends that the trial court erred in declaring that the formations under the Fate lease were gas zones and not productive of oil, arguing the evidence does not support the trial court's finding and that the court was without jurisdiction to make that determination. In three subpoints, they contend that (1) there were no pleadings to support the declaratory judgment, (2) there was no evidence that the formations were not productive of oil, and (3) the judgment was a collateral attack on the Railroad Commission's classification of the Raw Hide Fate wells, citing *Amarillo Oil Co. v. Energy–Agri Products, Inc.*, 731 S.W.2d 113 (Tex.App.—Amarillo 1987, writ granted). We disagree.[3]

■ The first and second subpoints are discussed more fully under other points of error addressed hereinbelow. In considering the jurisdictional question presented by the third subpoint, we note that the pleadings and evidence show that Maxus' cause of action was one to establish the ownership of and title to gas produced from formations under the Fate lease, and to recover damages for the gas converted by Raw Hide. Consequently, this action is one which involves title and ownership rights to property, and it is properly within the trial court's jurisdiction. Furthermore, this action does not constitute an impermissible collateral attack on any Railroad Com-

3. The breadth of the permanent injunction has not been challenged by point of error and we are, therefore, not called upon to express an opinion concerning it.

mission classification. *Dorchester Gas Prod. Co. v. Harlow Corp.*, 743 S.W.2d 243, 251 (Tex.App.—Amarillo 1987, writ requested). Accordingly, we overrule the jurisdictional attack presented by the third subpoint of point of error number eleven. We also overrule the first and second subpoints, which are analogous to issues raised in points of error discussed hereinbelow.

By their first point of error, Raw Hide Oil and Raw Hide Production attack the trial court's award of attorney's fees to Maxus, contending that (1) under the substantive law of conversion, Maxus' action for conversion does not support an award of attorney's fees since there was no finding of malice or fraud; (2) the trial court's declaratory judgment on the conversion issue cannot support an award of attorney's fees; (3) the trial court did not award Maxus a declaratory judgment or a judgment based upon adverse possession; (4) the trial court did not award Maxus a declaratory judgment on adverse possession; and (5) the declaratory judgment rendered is not supported by the pleadings and cannot support an award of attorney's fees. We disagree and find that the pleadings and evidence support the judgment.

In its third amended original petition, Maxus sought a judgment under the Uniform Declaratory Judgments Act, Tex.Civ. Prac. & Rem.Code Ann. § 37.001 *et seq.* (Vernon 1986):

> [D]eclaring and determining that Raw Hide Production and Raw Hide Oil & Gas have failed to case off, save or protect [Maxus'] gas as required under its Gas Lease and that gas or natural gas liquids that may be produced from the Raw Hide Fate wells belongs to [Maxus]. A genuine controversy has arisen between Plaintiff and said Defendants as to the ownership of the gas that has been and will be produced by the Raw Hide Fate wells.

Maxus also prayed for attorney's fees. The judgment declared that Maxus owned the sole and exclusive right to gas produced from four formations under the lease, that those formations were gas zones and not productive of oil, and that the gas produced by Raw Hide Production from these formations was gas rights gas belonging to Maxus.

It is axiomatic that the Uniform Declaratory Judgments Act should be liberally construed. *Guilliams v. Koonsman*, 279 S.W. 2d 579, 583 (Tex.1955); Tex.Civ.Prac. & Rem.Code Ann. § 37.002(b) (Vernon 1986). Although no particular type of pleading is required, the general rules regarding petitions govern such actions. *Anderson v. McRae*, 495 S.W.2d 351, 358 (Tex.Civ.App. —Texarkana 1973, no writ). Where no special exceptions have been presented, as here, the pleading must be construed liberally in favor of the pleader. *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex.1982). This general rule of construction is applicable to declaratory judgment actions. *Frost v. Sun Oil Co.*, 560 S.W.2d 467, 473 (Tex. Civ.App.—Houston [1st Dist.] 1977, no writ); *Anderson v. McRae*, 495 S.W.2d at 358.

The Uniform Declaratory Judgments Act provides that the court may award reasonable and necessary attorney's fees as are just and equitable. Tex.Civ.Prac. & Rem. Code Ann. § 37.009 (Vernon 1986). The phrase "just and equitable" has been given a broad construction under the statute. *First National Bank at Lubbock v. John E. Mitchell Co.*, 727 S.W.2d 360, 363 (Tex. App.—Amarillo 1987, no writ). Under the Uniform Declaratory Judgments Act, attorney's fees may be awarded to a party other than the prevailing party, or to a party defending a declaratory judgment action, even though that party sought no affirmative relief under the statute. *Sears Sav. & Profit Sharing Fund v. Stubbs*, 734 S.W. 2d 76, 80 (Tex.App.—Austin 1987, no writ); *Ritchie v. City of Fort Worth*, 730 S.W.2d 448, 451 (Tex.App.—Fort Worth 1987, writ ref'd n.r.e.); *Tanglewood Homes Ass'n, Inc. v. Henke*, 728 S.W.2d 39, 45 (Tex.App. —Houston [1st Dist.] 1987, writ ref'd n.r. e.); *First National Bank at Lubbock v. John E. Mitchell Co.*, 727 S.W.2d at 363; *District Judges of Collin County v. Commissioners Court of Collin County*, 677 S.W.2d 743, 746 (Tex.App.—Dallas 1984, writ ref'd n.r.e.). In a declaratory judg-

ment action, the award or denial of attorney's fees is within the sound discretion of the trial court, and the judgment will not be disturbed on appeal absent a clear abuse of discretion. *Oake v. Collin County,* 692 S.W.2d 454, 455 (Tex.1985).

■ Here, Maxus and Raw Hide stipulated that reasonable and necessary attorney's fees were $200,000 through trial, $37,500 for an appeal to this Court, and $17,500 for an application for writ of error to the Texas Supreme Court. However, the parties did not stipulate that any party was entitled to recovery of attorney's fees. Raw Hide does not attack the award as being unjust or inequitable. Under this record, Maxus plead and proved that Raw Hide Production and Raw Hide Oil failed to case off, save and protect its gas, and that a controversy had arisen concerning ownership of the gas produced from the Raw Hide Fate wells. Maxus also plead for and produced evidence of attorney's fees. Hence, the pleadings and evidence are sufficient to support both the declaratory judgment action and the judgment rendered. As a result, the award of attorney's fees was appropriate. Finding no abuse of discretion in the award of attorney's fees, point of error number one is overruled.

■ By their second point of error, Raw Hide contends that the trial court erred in submitting special issue number seven, arguing that the judge gave an improper definition of the term "oil." We disagree.

In this connection, the record shows the following instruction, jury answers, and definition of oil:

## SPECIAL ISSUE NO. 7

Do you find from a preponderance of the evidence that oil exists in any of the following formations under the Raw Hide Fate Lease?

Answer yes or no as to each formation:

| | |
|---|---|
| Red Cave Formation | No |
| Brown Dolomite | No |
| White Dolomite | No |
| Moore County Lime above 347 feet above sea level | No |
| Below 347 feet above sea level | No |

You are instructed that the word "oil" means crude petroleum oil, that is liquid both in the reservoir and at the surface, that is native to the reservoir and that is producible under normal operating conditions.

Raw Hide argues that the instruction was too restrictive because it required the jury to determine that oil was "producible under normal operating conditions." Raw Hide alternatively sought a statutory definition that oil is "crude petroleum oil, crude petroleum, and crude oil" or "crude petroleum oil". *See* Tex.Nat.Res.Code Ann. §§ 85.001(b) and 86.002(1) (Vernon 1978). They reason that the existence of *any* oil is the critical issue regardless of whether the oil is producible under normal operating conditions.

In *Dorchester Gas Prod. Co. v. Harlow Corp.,* 743 S.W.2d 243 (Tex.App.—Amarillo 1987, writ requested), the jury found that the two wells drilled under that lease in the Brown Dolomite formation were not productive of oil. In *Dorchester,* a similar jury instruction survived attack. *Id.* at 257. In effect, we have already concluded that a similar instruction was material.

A central issue in this case is which party owned the gas produced from the Raw Hide Fate wells, the gas rights owner, Maxus, or the oil and casinghead gas rights owner, Raw Hide. Casinghead gas is currently defined as any vapor or gas indigenous to an oil stratum and produced with oil. Tex.Nat.Res.Code Ann. § 86.002(10) (Vernon 1978). At the time the 1938 Coffee lease was executed, the term casinghead gas was defined as "any gas and/or vapor indigenous to an oil stratum and produced from such stratum with oil." Gas Waste Prohibited, Restricting Production of Wells and Prescribing Penalties For Violations, ch. 120, § 2(i), 1935 Tex.Gen. Laws 318, 319, amended and codified, Tex. Nat.Res.Code Ann. § 86.002(10) (Vernon 1978). The 1938 Coffee lease expressly incorporated this earlier definition of casinghead gas. Since the wells are not pro-

ductive of oil under normal operating conditions, the gas produced therefrom is not casinghead gas and is not owned by the oil and casinghead gas owner. Moreover, since there was evidence that some oil had been previously pumped into the well, and because there was evidence that both the weather during the test and the test equipment itself may have inhibited oil production, we find that the challenged portion of the instruction was relevant. Accordingly, point of error number two is overruled.

■ In their third point of error, Raw Hide contends that the trial court erred in submitting special issue number three, arguing that this special issue erroneously placed the burden of proof on Raw Hide. We disagree.

Special issue number three provided and was answered as follows:

State the percentage of the gas produced by the Raw Hide Fate wells during the court-ordered test that was gas rights gas and the percentage that was casinghead gas.

In connection with Special Issue No. 3 and 4, you are instructed that Raw Hide has the burden of establishing by a preponderance of the evidence how much of the gas they produced was not gas rights gas. You are instructed that the total of the percentages you find for gas rights gas and for casinghead gas must equal 100%.

Answer with a percentage or "0".

Answer:

| | |
|---|---|
| Gas rights gas: | 100% |
| Casinghead gas: | 0% |
| Total: | 100% |

In *Dorchester Gas Prod. Co. v. Harlow Corp.*, 743 S.W.2d at 256, we held that the burden of proof is not exclusively determined by which party is the plaintiff, recognizing that a consideration in determining the burden is which party has peculiar knowledge of the facts to be proved. In *Dorchester,* it was undisputed that the casinghead gas rights owner had comingled gas rights gas from the Brown Dolomite formation with oil and casinghead gas from other formations, and that the casinghead gas rights owner had peculiar knowledge concerning the production of gas from the formations.

Raw Hide argues that they were not in a position to have peculiar knowledge of the facts to be proved because both parties participated in the court-ordered test, agreed on the manner in which the test would be conducted, and monitored the test results. Raw Hide also argues that the gathering system was designed and installed by Maxus. Raw Hide reasons that since the comingling, if any, was a result of the gathering system, Maxus should bear the burden of proving the percentages of gas rights gas and casinghead gas.

Maxus argues that the burden is properly on Raw Hide because (1) Raw Hide was exclusively responsible for drilling and completing the wells in a manner that created the allocation problem, (2) Raw Hide was responsible for operating the wells during the test period, and (3) Maxus only gathered the gas and operated the lease compressor during the test. We agree that the party drilling and completing wells in a manner that creates the allocation and ownership problems should bear the burden of proof.

Without citation to authority, Maxus alternatively argues that special issue number three was rendered irrelevant by the answer to special issue number seven. An answer to a special issue can be disregarded only when there is no evidence to support the answer, or when it is rendered immaterial. A special issue is rendered immaterial when (1) although properly submitted, it becomes inconsequential by other findings; or (2) it should not have been submitted. *C. & R. Transport, Inc. v. Campbell,* 406 S.W.2d 191, 194 (Tex.1966); *J.R. Neatherlin Corp. v. Baughman,* 580 S.W.2d 129, 130 (Tex.Civ.App.—Houston [14th Dist.] 1979, writ ref'd n.r.e.); *Estate of Lee,* 564 S.W.2d 392, 394–95 (Tex.Civ. App.—Dallas 1978, writ ref'd n.r.e.).

■ Here, the answer to special issue number three was rendered inconsequential by the answer to special issue number sev-

en. Since the jury found that none of the formations were productive of oil and because all the Raw Hide Fate wells were completed or perforated in or close to those formations and could have produced exclusively from those formations, the gas produced therefrom was gas rights gas. Point of error number three is overruled.

Points of error numbers four and five present factual and legal sufficiency points which will be discussed in conjunction with point of error number nine below.

By their sixth point of error, Raw Hide contends that the trial court erred in refusing their requested special issue numbers one and two, contending that there was sufficient evidence to support their submission. We disagree.

Without citation to authority, Raw Hide contends that vaporized oil belongs to the oil and casinghead gas rights owner, although produced as gas. Referring us to evidence that oil had vaporized since 1938 and is now in a gaseous state, Raw Hide contends that the refused issues were relevant to support its theory that Maxus had converted vaporized oil belonging to Raw Hide. Maxus claims that the requested issue is irrelevant, arguing that (1) its Coffee H–1 is not located on the Raw Hide Fate lease and resultantly, it could not have converted gas owned by Raw Hide; (2) since the Maxus well never produced oil, any vaporized oil would not have been casinghead gas; (3) since Raw Hide did not obtain any rights to oil and casinghead gas until 1984, the reservoir's condition in 1938 was irrelevant to oil converted from Raw Hide; and (4) Raw Hide's conversion theory was properly submitted and answered negatively through special issue numbers eight, nine, ten, and eleven.

Raw Hide requested the following special issues, denominated one and two by them, which were refused by the trial court.

Do you find from a preponderance of the evidence that any of the gas currently being produced by Maxus Exploration Company was in a liquid state on May 1, 1938?

Answer "we do" or "we do not"

Answer: _____

If you answered Special Issue No. _____ "we do", then answer the following Special Issue; otherwise do [not] answer the following Special Issue.

\*    \*    \*    \*    \*    \*

Find from a preponderance of the evidence the amount of gas currently being produced by Maxus Exploration Company that was in a liquid state on May 1, 1938.

Answer by a percentage of the current production of Maxus Exploration Company.

Answer: _____

In special issue number eight, the jury found that Maxus had not converted any oil or casinghead gas since 1984 on the E/2 of Section 237. Based upon this finding, the jury was not required to answer special issue numbers nine, ten, and eleven, which were conditioned upon a finding that Maxus converted oil and casinghead gas. Special issue numbers nine, ten, and eleven inquired into the fair market value of the oil and casinghead gas converted by Maxus.

Because Maxus produced no oil from the Coffee H–1 well, there is no evidence that Maxus ever encountered oil or casinghead gas. Hence, under the express terms of its lease, Maxus could not have failed to properly case off, save or protect oil or casinghead gas. Moreover, the jury found that Maxus had not converted any oil since June 1984 in its answer to special issue eight. Notwithstanding the fact that we conclude that there is no legal basis for the proposition that vaporized oil is "oil" for purposes of determining ownership, the evidence of vaporized oil was before the jury when they answered issue number eight. The failure to submit Raw Hide's requested special issues could not have caused the rendition of an improper judgment because said special issues were irrelevant and rendered inconsequential by the answer to special issue number eight. Tex.R.App.Proc. 81(b)(1). Point of error number six is overruled.

In Raw Hide's seventh point of error, they contend that the trial court erred in refusing their requested special issue numbers three, four, five, and six, claiming that the evidence was sufficient to warrant submission. Referring to evidence in the record that oil had vaporized and migrated into the Maxus well since 1938, Raw Hide reasons that an inference is raised that Maxus did not case off, save or protect the oil as required by the 1938 Coffee lease. We disagree.

Raw Hide's requested special issues asked (1) whether Maxus failed to case off, save or protect the oil and casinghead gas since 1938; (2) the amount of oil that Maxus produced since June 1984 due to the failure to case off, save or protect the oil; (3) whether the failure to case off, save or protect the oil was done with malice; and (4) what sum of money, if any, should be assessed against Maxus as exemplary damages for failure to case off, save or protect the oil.

The 1938 Coffee lease agreement provided that if the gas rights owner "encounter[s] oil in any well ... then [Maxus] shall use reasonable care and caution to case off any such oil and/or casinghead gas that may be encountered therein."

Since there was no evidence that Maxus ever *encountered* oil, there was no error in failing to submit the requested special issues. *Horton v. Harris*, 610 S.W.2d 819, 823 (Tex.Civ.App.—Tyler 1980, writ ref'd n.r.e.). Moreover, the failure to submit the requested special issues could not have caused, and probably did not cause, the rendition of an improper judgment. Tex.R. App.P. 81(b)(1); *Howard v. Faberge, Inc.*, 679 S.W.2d 644, 650 (Tex.App.—Texarkana 1987, writ ref'd n.r.e.). Point of error number seven is overruled.

In their eighth point of error, Raw Hide contends that the trial court erred in refusing to permit them to present evidence concerning the Powell "C" lease. We conclude that Raw Hide failed to preserve error by an offer of proof or bill of exception, and overrule the point of error.

At a pretrial hearing, the court granted a motion in limine concerning evidence of the Powell "C" lease, operated by Maxus and located approximately ten miles west of the instant tract. In a hearing outside the jury's presence, Raw Hide argued that Maxus opened the door to evidence regarding the Powell "C" lease. No evidence was offered at that hearing. The court ruled that the circumstances did not "authorize the proffer of evidence, and so it will not be allowed in the present state of the record." Shortly thereafter, the court provided Raw Hide an opportunity to make an offer of proof. However, Raw Hide declined, stating that they would prefer to make their offer later.

Prior to the close of the evidence, Raw Hide submitted to the trial court a document entitled "Offer of Proof and Bill of Exception," concerning the Powell "C" lease. The judge stated that he would read it, rule on it, and file it with the clerk. Prior to the charge being read to the jury, Raw Hide asked the judge if he had acted on the bill of exceptions. Viewing the document as a formal bill and not an offer of proof, the judge stated that it was too voluminous for him to act upon at that time and that a ruling would be made later. The record reflects that the trial court did not rule on the offer and no objection was lodged to the failure to rule before the charge was read to the jury.

On February 3, 1988, 105 days after the amended judgment was signed, a hearing was held by conference call on Raw Hide's Offer of Proof and Bill of Exceptions. This document, file marked February 3, 1988, contains approximately twenty pages of facts and arguments, and approximately 140 pages of attached exhibits. The court disallowed the bill of exceptions, except as to those matters properly and timely shown in the statement of facts.

To preserve error concerning the exclusion of evidence by offer of proof, the appellate record must show that (1) the substance of the evidence sought to be admitted was made known to the court, and (2) the court either ruled adversely to its admission or, after timely request, affirmatively refused to rule. *Disposal Supply Co. Inc. v. Perryman Bros. Trash*

*Service, Inc.,* 664 S.W.2d 756, 762 (Tex. App.—San Antonio 1983, writ ref'd n.r.e.); *O'Shea v. Coronado Transmission Co.,* 656 S.W.2d 557, 564 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.); Tex.R.Civ. Evid. 103(a)(2) & (b); Tex.R.App.P. 52(a). An objection to the trial court's refusal to rule is sufficient to preserve error for appellate complaint. Tex.R.App.P. 52(a). An offer of proof or objection to the refusal to rule on the offer must be made prior to the court's charge being read to the jury. Tex. R.App.P. 52(a) & (b).

Assuming arguendo that Raw Hide timely requested the court to admit the evidence contained in the Offer of Proof and Bill of Exceptions, the court did not rule on the offer and no objection was made to the court's failure to rule prior to the charge being read to the jury. Consequently, Raw Hide did not timely obtain a ruling on the offer nor timely object to the court's failure to rule.

■ We must now determine if the Offer of Proof and Bill of Exceptions qualified as a formal bill of exception.[4] A formal bill of exception not approved by the trial court or opposing counsel and not a bystanders bill, is inadequate to preserve appellate complaint. *Sisk v. Randon,* 123 Tex. 326, 70 S.W.2d 689, 692 (1934); *Fountain v. Nelson,* 546 S.W.2d 102, 104 (Tex.Civ.App.—Beaumont 1977, no writ); *Goodpasture v. Coastal Industrial Water Authority,* 490 S.W.2d 883, 885 (Tex.Civ.App.—Houston [1st Dist.] 1973, writ ref'd n.r.e.); *Dyches v. Ellis,* 199 S.W.2d 694, 697 (Tex.Civ.App.—Austin 1947, no writ). We conclude that Raw Hide's Offer of Proof and Bill of Exceptions does not qualify as a formal bill of exception because it was not approved by the trial court or opposing counsel and it is not a bystanders bill. Consequently, point of error number eight is overruled.

We now turn to Raw Hide's factual sufficiency and legal sufficiency points of error numbers four, five, and nine. By their fourth point of error, Raw Hide contends that there is no evidence to support the jury's answer to special issue number three; or, alternatively, the jury's answer is against the great weight and preponderance of the evidence.[5] By their fifth point of error, Raw Hide contends that the trial court erred in awarding Maxus the funds in the registry of the court because, as a matter of law, there was at least some casinghead gas produced during the court-ordered test period. Finally, by their ninth point of error, Raw Hide contends that there was no evidence to support the jury's answer to special issue number seven; or, in the alternative, the jury's answer was against the great weight and preponderance of the evidence. We find that Raw Hide's contentions are misplaced, and will overrule point of error numbers four, five, and nine for the following reasons.

■ Factual sufficiency points of error concede conflicting evidence on an issue, yet maintain that the evidence against the jury's finding is so great as to make the finding erroneous. Factual sufficiency points of error are designated as "insufficient evidence points" or "great weight and preponderance points", depending upon whether the complaining party had the burden of proof. Legal sufficiency points of error assert a complete lack of evidence on an issue. Legal sufficiency points of error are designated as "no evidence points" or "matter of law points", again depending upon whether the complaining party had the burden of proof. The appropriate challenge to a jury finding concerning an issue upon which the complaining party had the burden of proof is either a great weight

4. We express no opinion as to whether Raw Hide timely filed the bill of exception. In this regard, the record shows that (1) the Offer of Proof and Bill of Exceptions was given to the trial judge on September 22, 1987, (2) the verdict was returned on September 23, 1987, (3) the Amended Final Judgment was signed on October 21, 1987, and (4) the Offer of Proof and Bill of Exceptions was file-marked February 3, 1988. *See* Tex.R.App.P. 52(c)(11).

5. We note that, although we have determined that special issue number three was rendered inconsequential by the jury's answer to special issue number seven, we believe a discussion of the legal and factual sufficiency point of error is appropriate in view of the interrelationship between points of error numbers four, five, and nine.

and preponderance point or a matter of law point. Conversely, the appropriate challenge to a jury finding concerning an issue upon which the complaining party does not have the burden of proof is either an insufficient evidence point or a no evidence point. *See* Calvert, "No evidence" and Insufficient evidence" Points of Error, 38 Tex.L.Rev. 361, 364–368 (1960); *Glover v. Texas Gen. Indem. Co.,* 619 S.W.2d 400 (Tex.1981).

Although Raw Hide has inappropriately designated its points of error, we are required to review each attack in its proper context. *O'Neil v. Mack Trucks, Inc.,* 542 S.W.2d 112, 113–114 (Tex.1976).

In reviewing a no evidence point, we must examine the record in the light most favorable to the finding to determine if there is any probative evidence, or reasonable inferences therefrom, which supports the finding, and we must disregard all evidence or reasonable inferences therefrom to the contrary. *Glover v. Texas Gen. Indem. Co.,* 619 S.W.2d at 401; *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). In reviewing an insufficient evidence point, we must examine the entire record to determine if there is some probative evidence to support the finding, and, if there is, we must determine whether the evidence supporting the finding is so weak or the answer so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Garza v. Alviar,* 395 S.W.2d at 823; *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). In reviewing matter of law points, we must examine the record for evidence that supports the finding, ignoring any evidence to the contrary; and, if there is no evidence to support the finding, we must then examine the entire record to determine if a contrary proposition is established as a matter of law. *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex.1982); *Texas & N.O.R. Co. v. Burden,* 146 Tex. 109, 203 S.W.2d 522, 530 (1947). In reviewing great weight and preponderance points, we must examine the entire record to determine if there is some evidence to support the finding, and then determine whether, in light of the entire record, the finding is manifestly

unjust. *Traylor v. Goulding,* 497 S.W.2d 944, 945 (Tex.1973); *In re King's Estate,* 244 S.W.2d at 661.

■ As discussed under point of error number three above, Raw Hide had the burden of proof on special issue number three, pertaining to the percentage of gas produced from the Raw Hide Fate wells during the court-ordered test period that was gas rights gas and the percentage that was casinghead gas. In that special issue the jury found that 100% of the gas produced from the Raw Hide Fate wells was gas rights gas. Because Raw Hide had the burden of proof on special issue number three, the appropriate standard for our review of point of error number four is whether the jury's finding was inappropriate as a matter of law, or whether such finding is against the great weight and preponderance of the evidence. Furthermore, we conclude that point of error number five, pertaining to the trial court's award of all the funds in the registry of the court to Maxus, presents a matter of law point; and, accordingly, it will be reviewed in that context. Finally, we conclude that Raw Hide did not have the burden of proof with regard to special issue number seven, pertaining to the existence of oil in any of the listed formations under the Fate lease. Accordingly, point of error number nine presents a no evidence or insufficient evidence point.

The record shows that several Maxus representatives were sent to watch well production tests on the Fate lease and fill out forms describing their observations. Data from the production tests was reported on a Railroad Commission form W–2. These tests were conducted in 1985 and Maxus monitored the results on six wells. Maxus' representatives reported that during the 24-hour test period, oil production varied from a low of 7 barrels to a high of 38 barrels per well. Raw Hide reported that the Raw Hide Fate No. 7 produced about 63 barrels of oil during the test.

Kent Kirkpatrick, a production engineer for Maxus, was not convinced that the test results established that these Raw Hide

Fate wells were capable of commercial oil production. Kirkpatrick cited inconsistencies in the test results and the lack of any observed preflow prior to testing. Kirkpatrick testified that preflow would stabilize the well so that a correct reading on the well's oil production could be obtained. Without a preflow, the W–2 test could measure the well's oil production over a longer period of time than the 24–hour test period. For instance, he testified that without a preflow the 24–hour test could measure a well's production for a three-month period.

Kirkpatrick also testified that Maxus' representatives had only observed tank gauges, and could not be certain that the tank contained 100% oil. Kirkpatrick stated that on July 2, 1985, Raw Hide reported total oil production of approximately 299 barrels on the W–2 forms. On January 2, 1986, Maxus' representatives observed the gauging of the tank and only 110 barrels were measured. Kirkpatrick stated that Dan Hipkins, a Raw Hide employee, had reported that no oil was sold on the lease until May 1986. At the end of the court-ordered test, the gauge showed approximately 124 barrels of oil. On May 3, 1986, a Maxus representative observed the tank gauge, indicating approximately 395 barrels of oil. Kirkpatrick could not explain these discrepancies. Kirkpatrick concluded that the court-ordered tests were fair, that no casinghead gas had been produced from the wells, and that Raw Hide had not cased off, saved or protected Maxus' gas.

Richard Strickland studied the Coffee H–1 well and nine other wells on the eight sections surrounding Section 237. The first of these ten wells was completed in July 1936 and the last was completed in May 1953. From the completion date of each well to January 1984, the ten wells collectively produced approximately 270.2 BCF of gas and no oil. Each well was completed in or approximate to the Brown Dolomite formation. The ten wells were completed with open hole casing below the Brown Dolomite. Strickland testified that there was a very small potential, if any, for oil production in the Brown Dolomite. He reported that Section 237 was more likely to be productive of gas because the Brown

Dolomite formation under that section has high structural elevation. He later reported that the Brown Dolomite, Moore County Lime, and Arkosic Dolomite formations do not appear productive of oil under Section 237. Assuming that the Arkosic Dolomite was part of the Moore County Lime, Strickland reported that his opinions would be the same.

Strickland compared the W–2 results to the court-ordered test results. He noted that in both tests gas production was comparable, and water production was significant. However, he stated that very little oil entered the well bores during the court-ordered test, and that such amount of oil could not be considered oil production by any standards. Strickland also compared the per square inch pressures in the casing during the W–2 tests and the court-ordered tests, and concluded that (1) the pressure differences were insignificant, (2) some oil was produced at lower pounds per square inch gauge pressures during the court-ordered tests, (3) the gas produced from the Raw Hide Fate wells was not casinghead gas, and (4) the Raw Hide Fate wells could not produce casinghead gas.

Dan Hipkins, vice-president of Raw Hide Oil, testified that oil was transported to the well-site for use in drilling the wells. He estimated that about 50 barrels of oil were used in each of the wells, and that it was common practice to inject oil when drilling through the Brown Dolomite. Hipkins stated that the injected oil is usually circulated out of the well through the mud pump with other cuttings. Hipkins reported that he conducted the preflow stabilization the day before the W–2 test, when Maxus' representatives were not present. He stated that he generally runs the preflow for about 20 to 24 hours prior to the W–2 test potential. However, he later conceded that he had previously reported that he started the preflow, watched the gas pressure gauge until it stabilized, stopped the test when he saw oil flow into the pit, and then started the W–2 test. He admitted that oil production was so erratic that it was impossible to keep production records.

Hipkins testified that the Railroad Commission conducted tests on the Coffee H-1 well and concluded that it was not producing oil. Disagreeing with the way the tests were performed, Hipkins stated that he obtained a sample he believed was oil and sent it to a lab, where an analyst concluded that the sample was oil. However, the Railroad Commission, citing the lab's test results, concluded that the sample was condensed water.

It is uncontroverted that the Raw Hide Fate wells produced some oil; however, the parties disagree whether such oil was native oil or oil previously injected into the wells during drilling. Raw Hide's expert, geologist Gray Johnston, reported that there were many oil wells in Moore County and some were producing from the Brown Dolomite formation at lower depths. Based upon a comparison of well logs from the Christie No. 1, a nearby well, to the Raw Hide Fate No. 10, Johnston further stated that the only way to know for certain was to complete, treat, and attempt to produce the well. Maxus' witness, Kent Kirkpatrick, testified that oil production on the Christie lease was insignificant and similar to that from the Raw Hide Fate lease. Raw Hide also produced evidence that oil existed under their lease, that the fracking of the Raw Hide Fate Nos. 5, 6, 7, and 8 could not have affected the Coffee H-1 well, and that the court-ordered tests were not fair.

After reviewing the evidence pursuant to the appropriate standards, we are convinced that the jury's answer to special issue number three, that 100 percent of the gas produced from the Raw Hide Fate wells during the court-ordered test was gas rights gas, is not against the great weight and preponderance of the evidence. We are equally convinced that the contrary position, i.e., that some of the gas produced was casinghead gas, was not established as a matter of law. Accordingly, points of error numbers four and five are overruled.

After having reviewed the evidence, we are convinced that the jury's answer to special issue number seven, that no oil exists in certain formations underlying the Raw Hide Fate lease, given the definition of oil which we have approved, has legally sufficient evidentiary support. Furthermore, we find that the evidence supporting the jury's answer to special issue number seven is not so weak, or the answer so contrary to the overwhelming weight of the evidence, as to be clearly wrong and manifestly unjust. From the record, there is expert testimony that (1) the Raw Hide Fate wells are not productive of oil, (2) the oil produced during the court-ordered test was not oil production by any standards, (3) the gas produced from the Raw Hide Fate wells was not casinghead gas, (4) the Coffee H-1 well and the nine nearby gas wells never produced any oil, and (5) oil production was unlikely under the Fate lease due to the high structural elevation of the Brown Dolomite formation in that location. Accordingly, point of error number nine is overruled.

In their tenth point of error, Raw Hide contends that the trial court erroneously excluded defense exhibit number 72, arguing that it was relevant to the issues at trial. We find that the exclusion of exhibit number 72 was harmless.

Geologist John B. Rogers testified that he had been the District Director for the Railroad Commission in Pampa from February 1, 1970, until his retirement in 1985. At a hearing outside the presence of the jury regarding the admission of exhibit number 72, Rogers testified that the exhibit was an excerpt from an annual report compiled by the Oil and Gas Division of the Railroad Commission. Rogers said that compilation of the report commenced in 1952, and that the report had been submitted to the Governor's office on an annual basis. Exhibit number 72 was included in the latest report, which was for 1985. Exhibit number 72 showed the Railroad Commission's classification of different types of oil and gas fields. It illustrated (1) non-associated gas fields, which are fields with gas, (2) associated gas fields, which have gas above with oil below, and (3) dissolved gas fields, which are totally comprised of oil.

Rogers identified the 1938 Coffee lease and the Fate lease as being located in an associated gas field as defined by the Railroad Commission. Rogers explained that the only way to change a gas well to an oil and casinghead gas well was for the production ratio to decrease to a point where the gas to oil ratio is less than 100,000 cubic feet of gas per barrel of oil. To change an oil well to a gas well, the gas to oil ratio must exceed 100,000 cubic feet of gas to one barrel. Defense exhibit number 72 is not included in the record before us.

In their brief, Raw Hide argues, without citation to authority, that there can be oil on top of gas and that the oil and gas formations are not necessarily straight formations. Raw Hide reasons that when oil is on top of gas, the oil and casinghead gas owner can perforate the well above the perforations in a nearby gas rights well. Raw Hide argues that the exhibit would show that its right to produce casinghead gas is not limited to perforations below those in the Coffee H–1. Additionally, Raw Hide claims that when exhibit number 72 is combined with the testimony of S.G. Johnston, it demonstrates that Raw Hide was producing from a formation productive of oil, and that the gas was therefore casinghead gas.

Maxus contends that the exclusion of exhibit number 72 did not cause the rendition of an improper judgment. It argues that the 1938 Coffee lease, and not exhibit number 72, controls where Raw Hide could perforate the wells. Maxus also argues that since the jury concluded that no oil exists in the pertinent formations under the Fate lease, the location of the perforations in those formations for the production of gas is irrelevant because casinghead gas cannot be produced where no oil exists.

We agree that the exclusion of exhibit number 72 was not such a denial of Raw Hide's rights as was reasonably calculated to cause and did probably cause the rendition of an improper judgment. Tex.R. App.P. 81(b)(1). In discharging its burden of showing that the exclusion of evidence was prejudicial, the party attacking the ruling need not prove that "but for" the ex-

cluded evidence, a different judgment would have necessarily resulted. Said party is only required to show that the excluded evidence probably resulted in the rendition of an improper judgment. *King v. Skelly*, 452 S.W.2d 691 (Tex.1970); *Howard v. Faberge, Inc.*, 679 S.W.2d 644, 648 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). Reversible error is not generally shown in connection with rulings on the admissibility of evidence unless the whole case turns on the particular evidence excluded. *Atlantic Mut. Ins. Co. v. Middleman*, 661 S.W.2d 182, 185 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.); *Bridges v. City of Richardson*, 349 S.W.2d 644, 649 (Tex.Civ.App.—Dallas 1961, writ ref'd n.r. e.).

Here, the jury found that oil cannot be produced from the pertinent formations underlying the Raw Hide Fate lease, and we have determined that the record supports that finding. Since oil is not productive from the pertinent formations under the Fate lease, the location of perforations which produced vapor from these wells was not critical to the outcome of the case because gas produced from those formations could not be casinghead gas by definition. Furthermore, the mere existence of oil within a formation does not mean that all wells producing from that formation are oil wells. *Jinkins v. Bryan*, 763 S.W.2d 539 (Tex.App.—Amarillo, 1988, n.w.h.) (not yet reported). Moreover, the excluded exhibit apparently showed that there were both oil wells and gas wells in the area surrounding the instant tract. Evidence of that fact had already been admitted through Johnston's testimony. Where excluded evidence is admitted elsewhere, error is not generally shown. *Wilson v. John Frantz Co.*, 723 S.W.2d 189, 194 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.). Consequently, the excluded evidence had little or no bearing on the issue of whether oil and casinghead gas was being produced from the pertinent formations under the Fate lease. The instant case did not turn on the excluded evidence and its exclusion did not result in the rendition of an improper judgment. Point of error number eleven is overruled.

Having separately disposed of the points of error raised by Raw Hide, we conclude that no reversible error has been presented. Accordingly, the judgment of the trial court is affirmed.

Before REYNOLDS, C.J., and DODSON, J.*

## ON MOTION FOR REHEARING

REYNOLDS, Chief Justice.

Raw Hide Oil & Gas, Inc. and Raw Hide Production Company, Inc. have filed a motion for rehearing, requesting a reconsideration of determinations made in our original opinion. Our reconsideration of the contentions expressed in the motion does not persuade us to change our original judgment of affirmance. Neither are we persuaded to write further upon the reconsideration other than to address Raw Hide's perception of our erroneous reliance upon authority cited in our opinion.

As previously noted, Raw Hide's second-point contention is that the trial judge gave an improper definition of the term "oil" in connection with special issue number seven. The definition, Raw Hide contends, is too restrictive because it required the jury to determine that oil was "producible under normal operating conditions."

Enroute to overruling the contention, we said in the 25th paragraph of our opinion, "In *Dorchester* [*Dorchester Gas Prod. Co. v. Harlow Corp.*, 743 S.W.2d 243 (Tex.App. —Amarillo 1987, writ requested) ], a similar instruction survived attack. *Id.* at 257. In effect we have already concluded that a similar instruction was material." Raw Hide notes that at page 257 of the *Dorchester* opinion there is a discussion of the definition of casinghead gas that was given in that case, and submits that the *Dorchester* opinion does not support the definition of oil, a different substance, that was used in this case.

It is apparent from Raw Hide's perception of our reference that we could have employed more specific language of communication. Nevertheless, the language we used was not an intended reference to the *Dorchester* definition of casinghead gas; rather, it was a reference to that earlier part of the page where it is recorded that the *Dorchester* jury, implicitly deliberating with a similar definition of oil, determined that the formation from which the wells were producing "is not productive of native oil under normal operating conditions." But aside from that, and more pertinent, we immediately followed the referential language with an explanation why the challenged definition was relevant to the issue, a sufficient basis for overruling Raw Hide's second-point contention.

The motion for rehearing is overruled.

because his term of office expired on 31 December 1988.

---

* Justice Pirtle, who authored the opinion for the Court on original submission, did not participate in the decision on motion for rehearing