NO. 07-01-0136-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL A



SEPTEMBER 12, 2001



______________________________




IN THE INTEREST OF OCTAVIA DEVON ALLEN, A CHILD







_________________________________



FROM THE 320TH DISTRICT COURT OF POTTER COUNTY;



NO. 61,637-D; HONORABLE JOHN T. FORBIS, JUDGE



_______________________________



Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

 In four points of error, appellant Helen M. Allen contends the trial court erred in
terminating the parent-child relationship between her and her minor son Octavia Devon
Allen. In her first three points, she contends the trial court erred in finding by clear and
convincing evidence that her parental rights should be terminated because the evidence
was legally, or in the alternative, factually insufficient to support such a finding. 
Specifically, she says there was insufficient evidence that 1) she engaged in conduct or
knowingly placed the child with persons who engaged in conduct that endangered the
physical and emotional well-being of the child; 2) the termination of the parent-child
relationship between Holli Rene Sinclair (1) and the child was in the child's best interest; 3)
she knowingly placed or knowingly allowed the child to remain in conditions or
surroundings that endangered the physical or emotional well-being of the child; and 4) she
had her parent-child relationship terminated with respect to another child based upon a
finding that her conduct was in violation of Texas Family Code § 161.001(1)(D) or (E). (2) 
Disagreeing that reversal is required, we affirm the judgment of the trial court.

Standard of Review

 Section 161.001 of the Family Code provides that parental rights may be terminated
if the trial court finds by clear and convincing evidence that the parent has engaged in
conduct of the type proscribed by the statute and if it also finds that termination would be
in the best interest of the child. The requirement of clear and convincing proof is
necessary because the termination of parental rights involves fundamental constitutional
rights. Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); In the
Interest of G.M., 596 S.W.2d 846, 847 (Tex. 1980). That standard means that the
evidence must be enough to produce in the mind of the factfinder a firm conviction or belief
that the allegations are true. In re A.D.E., 880 S.W.2d 241, 245 (Tex.App.--Corpus Christi
1994, no writ). The clear and convincing standard of review required to alter parental rights
does not alter the appropriate sufficiency standard of appellate review. Id. 

 The standards by which we consider legal and factual sufficiency challenges are
now so well established as to remove any necessity for their reiteration in detail. See Raw
Hide Oil & Gas, Inc. v. Maxus Exploration Co., 766 S.W.2d 264, 276 (Tex.App.--Amarillo
1988, writ denied). Suffice it to say that a "no evidence" or legal insufficiency point of error
will be sustained when 1) the record discloses a complete absence of evidence of a vital
fact; 2) the court is barred by rules of law or of evidence from giving weight to the only
evidence offered to prove a vital fact; 3) the evidence offered to prove a vital fact is no
more than a mere scintilla; or 4) the evidence establishes conclusively the opposite of the
vital fact. Uniroyal Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334 (Tex. 1998), cert.
denied, 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999). In considering a factual
insufficiency challenge, we must examine the entire record to determine if there is some
probative evidence to support the finding, and if there is, we must determine whether the
evidence supporting the finding is so weak or the answer so contrary to the overwhelming
weight of the evidence as to be clearly wrong and manifestly unjust. Raw Hide, 766
S.W.2d at 276. In performing that function, we must remember that the factfinder, as
opposed to the appellate court, also enjoys the right to resolve credibility issues and
conflicts within the evidence and to believe all, part, or none of the testimony espoused by
any particular witness. In the Interest of R.D.S., 902 S.W.2d 714, 716 (Tex.App.--Amarillo
1995, no writ).

 The nature of appellant's challenges require a somewhat detailed recitation of the
relevant evidence. Shannon Burch, an investigator for the Texas Department of Protective
and Regulatory Services (the Department) testified they received a report about medical
neglect of Octavia and, on February 10, 1997, Burch said she discussed Octavia's
abscessed teeth and asthma with appellant. She said that appellant "didn't seem to
understand that his abscessed teeth and everything were causing an infection that could
result in serious harm to him" if untreated. Burch said that surgery had been scheduled
several times, but appellant had canceled it. She also averred that appellant had her
parental rights terminated as to her other children. Burch stated that dental surgery had
been scheduled for February 25, but was canceled because appellant had given Octavia
candy the night before. Although appellant said she did not know he could not eat before
surgery, Burch averred she knew appellant had been told this on "all the previous
occasions" that surgery had been scheduled and then canceled.

 Under cross-examination, Burch admitted that appellant told her she was not
satisfied with the respiratory therapy her child had received. She said she believed there
had been four previous oral surgeries scheduled, but did not know the number from her
own knowledge. She also admitted that her other children had been removed before the
birth of Octavia. Burch also said that the Department considers a parent's previous history
with the agency, because "it shows their ability to adequately parent the child."

 Dr. William J. Kemp, Jr. testified that he was a pediatric dentist with 22 years
experience. Appellant brought Octavia to see him when he was two years old and told him 
the child was having pain in his teeth. The doctor found that Octavia had dental abscesses
of such severity that oral surgery was needed and he scheduled day surgery to treat the
child appropriately. The doctor said that if infection such as that present in the child was
not treated, it could have an effect on the general health of the child. He described the
infection as "extremely severe." Kemp felt that appellant understood what needed to be
done for the child. The surgery was first scheduled for August 14, 1997, but appellant and
the child did not appear. Appellant was contacted and the surgery rescheduled for
October, 1997. On that date, appellant and Octavia arrived and then disappeared.

 The doctor had no further contact with appellant and the child until August 4, 1999,
almost two years later. At that time, he said, there were "draining fistulas by the abscessed
teeth." He rescheduled surgery for September 24, 1999, and informed appellant of the
setting. A pre-operation physical was scheduled for September 23, 1999, but again,
appellant and Octavia failed to appear. Dr. Kemp did not see appellant or Octavia until
February, 2000. At that time, a pediatrician called from Northwest Texas Hospital and
asked him to evaluate Octavia's dental needs. He did so and decided that the child's
dental needs had not been taken care of during the two-year period and were much worse. 
At that time, the two teeth that had been abscessed were, according to the doctor,
"probably two of the worst abscessed teeth I have seen in my 22 years of practice,
fistulated sacks, cystic sacks around the root ends." The necessary oral surgery was
scheduled for the next morning, but appellant decided not to have the work done and fed
the child. Two weeks later, the surgery was rescheduled, but again, appellant fed the child
the night before and surgery could not be performed. Finally, after the Department had the
child's supervision, the necessary surgery was done on April 28, 2000. Two teeth were
removed, which would not have been necessary had they been properly treated. In his
view, the child had been subject to pain over the period the infection had existed and his
eating habits would have been affected. He believed appellant had been guilty of medical
neglect because of the pain and the infection's effect generally. Dr. Kemp admitted he had
told appellant of some risks that exist with any surgery, but she did not appear to be
agitated about them.

 Doctor Walter Joseph Bridges, a pediatric specialist, also testified. On February 2,
2000, Octavia was brought to Northwest Texas Hospital by appellant. At that time, the
child was suffering from respiratory distress, low oxygen saturation, and fever. He was
kept for two days with a prescribed continued course of treatment, including a hand-held 
nebulizer, antibiotics, and steroids. Appellant was given specific instructions as to how to
administer this course of treatment. However, the child was returned to the hospital
emergency room the day after his discharge suffering from wheezing, an increased
respiratory rate, decreased oxygen saturation, and a 104 degree fever. In the doctor's
opinion, Octavia's condition would not have worsened if appellant had followed the
prescribed course of treatment.

 Doctor Carmen Marie Werner, a private practice pediatrician, then testified. She
said that as a partner of Dr. Bridges, she was contacted when the child was returned to the
emergency room the second time. Her admitting diagnosis was that he was suffering from
asthma exacerbation and respiratory distress. During Octavia's admission examination,
she noted he had multiple abscesses in his mouth, which resulted from neglected dental
hygiene and many of his teeth had rotted down close to gum level. She also noticed that
the child's nutritional status was not good for his age. Although he was almost five years
old, he was still feeding primarily off a baby bottle. She also mentioned that she believed
that while Octavia was in the hospital, appellant had removed the child's oxygen mask and,
at times, the nurses would check the I.V. needle used for the administration of medicine
and find it was "mysteriously out."

 Appellant testified that she had not wanted the dental surgery performed because
she knew two other children that had silver caps put on and had pain after that. She also
had a niece whose children had oral surgery and continued to have pain. She also averred
that she had given Octavia the breathing treatments as the doctor had shown her. She
said she did not know that giving Octavia candy the night before the scheduled oral
surgeries would hurt. She also denied that she removed the child's oxygen mask or ever
pulled out his I.V. tube. She said that she had tried to follow the doctors' instructions about
Octavia's care. She did not have a residence at the time of the hearing and did not know
the address where she was supposedly living at the time of the hearing. Appellant was
unemployed at the time of the hearing and had been for some time.

 Our review of the evidence satisfies us that it is amply sufficient to justify the findings
of the trial court. Accordingly, all of appellant's points are overruled and the judgment of
the trial court is affirmed. 


 John T. Boyd

 Chief Justice


Do not publish. 
1. The record is not clear about the relevance of this point insofar as Holli Rene
Sinclair may be concerned.
2. Section 161.001(1)(D) concerns knowingly placing or knowingly allowing the child
to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. Section 161.001(1)(E) concerns engaging in conduct or knowingly
placing the child with persons who engaged in conduct which endangers the physical or
emotional well-being of the child. Tex. Fam. Code Ann. § 161.001(1)(D) & (E) (Vernon
Supp. 2001). 



eing older. The
acute portion of her injury had occurred within six to eight hours before the child was
brought to the hospital. The other was more than three or four days old and could not have
been caused by a fall. Additionally, a portion of R.M.'s brain had already died when she
arrived at the hospital. 

 There was also evidence of R.M. having suffered hemorrhages in her eyes. This
rarely occurred in a child who had not suffered traumatic brain injury due to abuse, the
evidence depicted. Additionally, the injury should have caused inflammation and severe
pain which have would resulted in noticeable irritability and crying. So too did the evidence
illustrate that P.M.'s birth sister had bruising to her skull caused by a major force, fractured
ribs some three to four weeks old, injury to the side of her head, and injury to her ear.

 Other evidence showed that 1) Lerma confessed to, but later denied, shaking R.M.
before death, 2) Lerma also gave conflicting testimony regarding what happened to the
baby, 3) Matice initially gave no explanation for the child's injuries but later indicated that
she may have fallen off a couch or been injured by the ambulance workers, 4) Lerma
claimed that R.M. did not cry and was always happy, 5) Lerma claimed not to know until
shortly before trial that Matice had a significant criminal history which included a charge for
child endangerment, though other evidence tended to contradict this, 6) Lerma continued
to live with Matice after the death of R.M. and two and half years later gave birth to P.M.,
7) Matice had struck Lerma both before and after the birth of P.M., 8) R.M. had suffered
multiple injuries over a period of time, 9) Matice tested positive for cocaine several times
after the Department of Family and Protective Services took custody of P.M., though Lerma
denied having any knowledge of his drug use, 10) Lerma admitted that she and Matice
were the only ones that had care of R.M. (other than Lerma's mother) immediately prior to
R.M. suffering the injuries leading to her death, 11) Lerma testified that she might let
Matice see P.M. if he was not using drugs, 12) Lerma knew that Matice took medication
to control his temper, 13) Norma Backs, who counseled with Lerma and Matice, found both
parents inconsistent and deceptive in the things they told her, 14) Backs found Lerma to
have a low I.Q. and to be a dependent type of personality who would need someone to
assist her with basic life skills, 15) Backs did not believe it was an obtainable goal for
Lerma to have a home and take care of her daughter by herself, 16) Backs questioned
Lerma's parenting skills and did not see much improvement in them, and 17) Backs did not
believe that Lerma could appropriately parent the child even with the help of her own
parents.

 From the foregoing, a jury reasonably could have formed a firm conviction and belief
that Lerma engaged in conduct or knowingly placed the child with persons who engaged
in conduct endangering the physical or emotional well-being of P.M. And, while evidence
appeared of record indicating that Lerma was employed, that she had attended and
completed the classes that the State required her to take, that Lerma's bonding with P.M.
had improved, that Lerma loved P.M., and that Lerma would not allow Matice to see the
child and would try to protect her, the jury could have chosen to believe from Lerma's
previous conduct that she either would or could not care for and protect the child. 

 As to the best interests of P.M., we note that the evidence establishing a statutory
ground for termination may also be used to support a finding that the best interests of the
child warranted termination of the parent/child relationship. In re C.H., 89 S.W.3d at 28;
In re P.E.W., 105 S.W.3d at 779. Other indicia susceptible to consideration are: 1) the
desires of the child; 2) the emotional and physical needs of the child now and in the future;
3) the emotional and physical danger to the child now and in the future; 4) the parental
abilities of the individuals seeking custody; 5) the programs available to assist those
individuals to promote the best interests of the child; 6) the plans for the child by those
individuals or by the agency seeking custody; 7) the stability of the home or proposed
placement; 8) the acts or omissions of the parent which may indicate that the existing
parent/child relationship is not a proper one; and 9) any excuse for the acts or omissions
of the parent. In re P.E.W., 105 S.W.3d at 779-80. Not all of these indicia need be shown
to favor termination, however. Id. at 780. Rather, all the State need do is present enough
evidence from which the factfinder can reasonably form a firm belief or conviction that the
child's best interests warrants termination. In re P.E.W., 105 S.W.3d at 780. 

 Next, in addition to that which has already been discussed, there was evidence that
1) P.M. was a year and a half old at the time of trial, 2) she had lived with the same foster
family since being removed from the care of Lerma at the age of three months, 3) she was
thriving with and bonding to her foster family, and 4) the foster family planned to adopt her. 
Also of record was evidence that 1) Lerma's parents were not considered an appropriate
placement, 2) they were not considered appropriate because they had allowed Matice (a
29-year-old male who they did not know) to move into their house after his release from
prison and impregnate Lerma (who was 17 at the time), 3) they refused to believe that
either Lerma or Matice had injured R.M., 4) Lerma's mother had made statements that she
would allow Matice to see the child if the child were in her custody, though she later denied
making them, and 5) P.M. needed a permanent placement in a stable environment. 

 Testimony that a mother cannot provide a stable, safe, and secure environment
supports a finding that it is in a child's best interest to terminate the mother's rights. See
Hann v. Texas Dep't of Protective & Regulatory Services, 969 S.W.2d 77, 83-84 (Tex.
App.-El Paso 1998, pet. denied) (upholding the termination because evidence appeared
of record illustrating that the parent could not provide such an environment). Such
evidence appears of record and it was enough to enable the factfinder to reasonably form
a firm conviction or belief that termination was in P.M.'s best interest. 

 Having overruled each issue, we affirm the order terminating the parental
relationship between Lerma and P.M.


 Brian Quinn

 Chief Justice

 

 

 
1. The parental rights of the father David Matice were also terminated, but he has not appealed. 
2. The State's witness list does not appear in the record.