NO. 07-07-0397-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

MAY 15, 2008
______________________________

IN THE MATTER OF J.W.M.
_________________________________

FROM THE COUNTY COURT AT LAW NO. 1 OF RANDALL COUNTY;

SITTING AS A JUVENILE COURT

NO. 4614-J; HONORABLE RICHARD DAMBOLD, JUDGE

_______________________________

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.
MEMORANDUM OPINION
          Juvenile appellant J.W.M. was adjudicated a delinquent child on January 22, 2007,
for assaulting a public servant. Acting on the State’s motion of June 5, the juvenile court
held a contested disposition hearing on June 28 and committed J.W.M. to the Texas Youth
Commission (TYC) for an indeterminate period. By two issues, J.W.M. appeals the
disposition. We will affirm the judgment of the trial court.
 
 
Background
          The evidence adduced at the June 28 disposition hearing revealed J.W.M.’s
involvement with the juvenile justice system began in 2002, when at age twelve he was
adjudicated a delinquent child for the misdemeanor assault of his mother. The court
placed J.W.M. under an order of probation that included a ninety-day placement in the
Randall County juvenile detention facility. According to Rita Sampson, J.W.M.’s former
probation officer, on admission to the program J.W.M. acted acceptably but then digressed
into episodes of aggressive and uncooperative behavior. It became necessary to place
him in isolation where, according to Sampson, he yelled, banged his head on the door and
stressed himself to the verge of unconsciousness. 
          The severity of J.W.M.’s behavior led the probation department to obtain his
placement at the New Horizons Residential Treatment Center near Goldthwaite in Mills
County, Texas. J.W.M.’s behavior was acceptable in the program and he eventually
moved into a transition program before returning to the home of his mother. He remained
on probation. 
          After a brief period of acceptable behavior at home, J.W.M. became, according to
Sampson, “rude and disrespectful, not following [his mother’s] rules...just defiant.” J.W.M.
was returned to the juvenile detention facility after allegedly assaulting his mother again. 
          The probation department then obtained a placement for J.W.M. at Cal Farley’s
Boys Ranch near Amarillo. For two months, his behavior in the residential program was
acceptable. But problems began, escalating from a school dress code violation to threats
against staff to a threat in a journal entry to “blow up” Boys Ranch. J.W.M. was discharged
from the facility and returned to juvenile court. 
          The court modified J.W.M.’s probation, conditioning it on placement once again at
New Horizons. In June 2006, after about eight months at New Horizons, J.W.M. assaulted
a staff member, knocking out some of the worker’s teeth. In August, J.W.M. was
discharged from the program and held in the Randall County juvenile detention facility
under at least one order of detention. For reasons the record does not explain, the
probation department recommended, and obtained from the juvenile court, an order
releasing J.W.M. from probation. 
          Back in the family home, J.W.M. began lying, staying out all night, skipping school,
and smoking cigarettes. The Mills County sheriff’s department referred J.W.M.’s assault
of the New Horizon’s staff person to Randall County authorities as an assault on a public
servant, a third degree felony.


 On January 22, 2007, J.W.M. was adjudicated in Randall
County for the Mills County assault but a disposition hearing was not immediately held
since at the time J.W.M. continued living with his mother and his behavior was considered
acceptable. 
          J.W.M. was truant from school during February and March 2007. On March 23,
having left home without permission, J.W.M. encountered Amarillo police officers. During
questioning he provided a false identity and then attempted to choke himself with the
sleeves of a sweatshirt in the presence of an officer. 
          On March 27, police were summoned to the home of J.W.M. J.W.M. was charged
with domestic violence because of a fight with his stepfather. 
          Following this episode, J.W.M.’s mother decided she could no longer handle her son
and released him to the temporary managing conservatorship of Child Protective Services
(CPS). Following an adversary hearing of April 12, the court appointed CPS temporary
managing conservator of J.W.M. and named his mother temporary possessory
conservator. 
          CPS placed J.W.M. at a shelter in Houston as no Amarillo area shelter would admit
him because of his behavior. After a “few weeks” in placement J.W.M. ran from the shelter
and on apprehension was placed in another shelter. When J.W.M. ran from the second
Houston shelter he was returned to Amarillo. According to CPS, by that time none of the
agency’s facilities in Texas were willing to accept J.W.M. 
          In Amarillo, J.W.M. spent daytime hours in the lobby of the CPS office or with
workers on outings. At night, he slept at an Amarillo shelter. At the disposition hearing,
a CPS worker who worked the night shift at the shelter testified of an occasion when
J.W.M. was smoking and so uncooperative that she became fearful of her safety and that
of the other shelter residents. On May 25, while bowling with a CPS worker, J.W.M. ran
away but was located later that day. 
          On May 30, CPS took J.W.M. to an Amarillo psychiatrist. After the appointment
J.W.M. became very upset and the psychiatrist made arrangements for his admission to
an Amarillo psychiatric hospital. J.W.M. ran from the hospital admissions area but was
located by police later that day. J.W.M. resisted the officers’ attempt to return him to the
hospital. During the episode, J.W.M. slipped from leg restraints in a police car and
attempted to kick out a rear window of the vehicle. On reaching the hospital, an officer
suffered a back injury while struggling to move J.W.M. from the vehicle into the facility. 
CPS was not able to obtain commitment of J.W.M. to the hospital and he was released
again to the agency’s care. By making a child-specific contract with Texas Hill Country, a
treatment center, CPS was able to place J.W.M. in that facility. 
          At the disposition hearing, Steven Nelson testified he had been J.W.M.’s CPS
caseworker for three or four weeks. When asked of the program at Texas Hill Country,
Nelson explained the facility primarily treats victims of head trauma. According to Nelson,
at the time of the hearing J.W.M. had been at Texas Hill Country three weeks and “so far,
no problems.” Nelson had no disposition recommendation, nor did Sampson as she had
little contact with J.W.M. since September 2006. 
          In hearing testimony, J.W.M.’s mother agreed her son historically exhibits
acceptable behavior initially after placement or return to his home before reverting to
inappropriate behavior. CPS supervisor Tiffany Hill opined that the program at Texas Hill
Country was not sufficient for meeting the long-range treatment needs of J.W.M. She
believed J.W.M. had psychological issues Texas Hill Country was not capable of treating. 
Hill recommended “some type of boot camp, TYC.” According to Casey Litherland, a
worker in CPS’s managing conservatorship program, because CPS had exhausted all
placement possibilities and because of J.W.M.’s poor placement history, commitment to
TYC was recommended. 
          After the close of evidence at the disposition hearing the court ordered J.W.M.
committed to TYC for an indeterminate period. J.W.M. filed a motion for new trial which
was apparently overruled by operation of law. See Tex. R. Civ. P. 329b(c). He timely filed
a notice of appeal.
Issues
          Through two issues, J.W.M. challenges the legal and factual sufficiency of the
evidence supporting the court’s finding that in his home J.W.M. “cannot be provided the
quality of care and level of support and supervision that [he] needs to meet the conditions
of probation.”
Discussion Once the court adjudges that a juvenile engaged in delinquent conduct, it possesses
broad discretion in reaching a disposition. In re C.J.H., 79 S.W.3d 698, 702
(Tex.App.–Fort Worth 2002, no pet.). A trial court abuses its discretion if it acts in an
arbitrary or unreasonable manner without reference to any guiding rules or principles. 
Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985). There is no
abuse, however, simply because a trial court decided an issue within its discretion
differently than would the reviewing appellate court. Id. at 242. 
          Under the abuse of discretion standard, the legal and factual sufficiency of the
evidence are not independent grounds of error, but are relevant factors for determining
whether the trial court abused its discretion.


 See Beaumont Bank, N.A. v. Buller, 806
S.W.2d 223, 226 (Tex. 1991); In re C.J.H., 79 S.W.3d at 702 n.10; In re J.R.C., 236,
S.W.3d 870, 875 (Tex.App.–Texarkana 2007, no pet.) (modification of disposition under
Tex. Fam. Code Ann. § 54.05 (Vernon Supp. 2007)). When appeal is taken from a bench
trial the court’s findings of fact “have the same force and dignity as a jury’s verdict upon
questions.” Anderson v. City of Seven Points, 806 S.W.2d 791, 794 (Tex. 1991). In
determining whether the evidence is sufficient to support the disposition ordered, we apply
a civil standard of review. In re J.P.R., 95 S.W.3d 729, 731 (Tex.App.–Amarillo 2003, no
pet.). 
          An appellant attacking the legal sufficiency of an adverse finding on an issue on
which he did not have the burden of proof must demonstrate there is no evidence
supporting the adverse finding. Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983). 
We sustain a no evidence challenge when “‘(a) there is a complete absence of evidence
of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the
only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is
no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of
the vital fact.’” King Ranch, Inc. v. Chapman, 118 S.W.3d 742, 751 (Tex. 2003) (quoting
Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997)).
          We determine the legal sufficiency of the evidence by finding whether the evidence
would enable reasonable and fair-minded jurors to reach the verdict under review. City of
Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005). In conducting the review, we consider
all of the evidence, giving deference to evidence favorable to the verdict if reasonable and
fair-minded jurors could and disregarding evidence contrary or unfavorable to the verdict
unless reasonable and fair-minded jurors could not. Id. 
          When we review a factual sufficiency challenge of a finding on an issue as to which
the appellant did not have the burden of proof, we consider and weigh all of the evidence,
both supporting and contrary to the judgment, and set aside the judgment only if the
evidence supporting the challenged finding is so weak that the finding is clearly wrong and
manifestly unjust. Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co., 766 S.W.2d 264,
276 (Tex.App.–Amarillo 1988, writ denied) (citing Garza v. Alviar, 395 S.W.2d 821, 823
(Tex. 1965)); see Dow Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex. 2001). The fact
finder is the exclusive judge of the credibility of witnesses and the weight given their
testimony. Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003).
          The Family Code prohibits a disposition under section 54.04 unless the child is in
need of rehabilitation or the protection of the public or the child requires a disposition. Tex.
Fam. Code Ann. § 54.04(c) (Vernon Supp. 2007). Commitment of a juvenile to TYC
requires the court find and express in its disposition order that: (A) it is in the child’s best
interests to be placed outside his home, (B) reasonable efforts were made to prevent or
eliminate the need for his removal from the home and to make it possible for the child to
return to his home, and (C) the child cannot be provided the quality of care and level of
support and supervision in his home that he needs to meet the conditions of probation. 
Tex. Fam. Code Ann. § 54.04(i)(1)(A)-(C) (Vernon Supp. 2007). Here, the juvenile court
made these findings in its disposition order. 
          J.W.M. argues that because at the time of the disposition hearing he was under the
temporary managing conservatorship of CPS the State stood in loco parentis. He then
reasons that his “home,” as that term is used in section 54.04(i)(1)(C), was Texas Hill
Country where his “parent,” the State of Texas, placed him. Thus, according to J.W.M.,
because during his three-week stay at Texas Hill Country his behavior was acceptable the
evidence was legally and factually insufficient to prove the level of care, support and
supervision received in his “home” were inadequate for probation. We find this argument
without merit.
          We have detailed the evidence of J.W.M.’s then five-year involvement with the
juvenile justice system. The evidence depicts a progressive effort by juvenile probation
officials and the juvenile court, working with treatment centers, a placement facility, mental
health workers and social workers, to assist J.W.M. while balancing the punitive and
rehabilitative components of the Juvenile Justice Code.


 When juvenile authorities and
J.W.M.’s mother exhausted possibilities of placement and care at home, CPS was
appointed temporary managing conservator of J.W.M. But even that agency could not
provide a placement from which J.W.M. did not run or cause disruption. While the three-week period between the placement of J.W.M. at Texas Hill Country and the disposition
hearing did not produce a report in evidence of antisocial behavior or unlawful conduct, this
is not inconsistent with the hearing testimony that historically following an initial period of
good behavior in a new environment J.W.M. reverts to inappropriate or unlawful behavior. 
Moreover, CPS supervisor Tiffany Hill did not believe Texas Hill Country could serve
J.W.M.’s long-term needs as he presented psychological problems the facility could not
treat. The evidence further showed no other placement for J.W.M. was available to CPS
or juvenile authorities. CPS worker Casey Litherland believed because CPS had
exhausted all placement options and J.W.M. would likely not succeed in placement at
Texas Hill Country, commitment to TYC was necessary. 
          Because the court heard uncontroverted testimony that J.W.M. engaged in unlawful
conduct before and after CPS assumed temporary managing conservatorship and Texas
Hill Country was not suitable for meeting J.W.M.’s long-term treatment needs, it is
unnecessary for us to decide whether his “home,” for the purpose of section 54.05(i)(1)(C),
was his family home or in the care of CPS. In either case, the evidence was legally and
factually sufficient to support the court’s finding that the home of J.W.M. did not provide
him the statutorily specified resources for meeting the conditions of a probation order. 
J.W.M. has not demonstrated the juvenile court abused its discretion by committing him
to TYC. We overrule J.W.M.’s first and second issues.
Conclusion
          Having overruled the two issues J.W.M. presents, we affirm the judgment of the trial
court.
 
                                                                           James T. Campbell 
                                                                                   Justice