NO. 07-07-0397-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

MAY 15, 2008
_____

IN THE MATTER OF J.W.M.
_____

FROM THE COUNTY COURT AT LAW NO. 1 OF RANDALL COUNTY;

SITTING AS A JUVENILE COURT

NO. 4614-J; HONORABLE RICHARD DAMBOLD, JUDGE

_____

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

**MEMORANDUM OPINION**

Juvenile appellant J.W.M. was adjudicated a delinquent child on January 22, 2007, for assaulting a public servant. Acting on the State's motion of June 5, the juvenile court held a contested disposition hearing on June 28 and committed J.W.M. to the Texas Youth Commission (TYC) for an indeterminate period. By two issues, J.W.M. appeals the disposition. We will affirm the judgment of the trial court.

## Background

The evidence adduced at the June 28 disposition hearing revealed J.W.M.'s involvement with the juvenile justice system began in 2002, when at age twelve he was adjudicated a delinquent child for the misdemeanor assault of his mother. The court placed J.W.M. under an order of probation that included a ninety-day placement in the Randall County juvenile detention facility. According to Rita Sampson, J.W.M.'s former probation officer, on admission to the program J.W.M. acted acceptably but then digressed into episodes of aggressive and uncooperative behavior. It became necessary to place him in isolation where, according to Sampson, he yelled, banged his head on the door and stressed himself to the verge of unconsciousness.

The severity of J.W.M.'s behavior led the probation department to obtain his placement at the New Horizons Residential Treatment Center near Goldthwaite in Mills County, Texas. J.W.M.'s behavior was acceptable in the program and he eventually moved into a transition program before returning to the home of his mother. He remained on probation.

After a brief period of acceptable behavior at home, J.W.M. became, according to Sampson, "rude and disrespectful, not following [his mother's] rules...just defiant." J.W.M. was returned to the juvenile detention facility after allegedly assaulting his mother again.

The probation department then obtained a placement for J.W.M. at Cal Farley's Boys Ranch near Amarillo. For two months, his behavior in the residential program was acceptable. But problems began, escalating from a school dress code violation to threats

2

against staff to a threat in a journal entry to "blow up" Boys Ranch. J.W.M. was discharged from the facility and returned to juvenile court.

The court modified J.W.M.'s probation, conditioning it on placement once again at New Horizons. In June 2006, after about eight months at New Horizons, J.W.M. assaulted a staff member, knocking out some of the worker's teeth. In August, J.W.M. was discharged from the program and held in the Randall County juvenile detention facility under at least one order of detention. For reasons the record does not explain, the probation department recommended, and obtained from the juvenile court, an order releasing J.W.M. from probation.

Back in the family home, J.W.M. began lying, staying out all night, skipping school, and smoking cigarettes. The Mills County sheriff's department referred J.W.M.'s assault of the New Horizon's staff person to Randall County authorities as an assault on a public servant, a third degree felony.[1] On January 22, 2007, J.W.M. was adjudicated in Randall County for the Mills County assault but a disposition hearing was not immediately held since at the time J.W.M. continued living with his mother and his behavior was considered acceptable.

J.W.M. was truant from school during February and March 2007. On March 23, having left home without permission, J.W.M. encountered Amarillo police officers. During questioning he provided a false identity and then attempted to choke himself with the sleeves of a sweatshirt in the presence of an officer.

---

[1] *See* Tex. Penal Code Ann. § 22.01(a)(b)(1) (Vernon Supp. 2007).

3

On March 27, police were summoned to the home of J.W.M.  J.W.M. was charged with domestic violence because of a fight with his stepfather.

Following this episode, J.W.M.'s mother decided she could no longer handle her son and released him to the temporary managing conservatorship of Child Protective Services (CPS).  Following an adversary hearing of April 12, the court appointed CPS temporary managing conservator of J.W.M. and named his mother temporary possessory conservator.

CPS placed J.W.M. at a shelter in Houston as no Amarillo area shelter would admit him because of his behavior.  After a "few weeks" in placement J.W.M. ran from the shelter and on apprehension was placed in another shelter.  When J.W.M. ran from the second Houston shelter he was returned to Amarillo.  According to CPS, by that time none of the agency's facilities in Texas were willing to accept J.W.M.

In Amarillo, J.W.M. spent daytime hours in the lobby of the CPS office or with workers on outings.  At night, he slept at an Amarillo shelter.  At the disposition hearing, a CPS worker who worked the night shift at the shelter testified of an occasion when J.W.M. was smoking and so uncooperative that she became fearful of her safety and that of the other shelter residents.  On May 25, while bowling with a CPS worker, J.W.M. ran away but was located later that day.

On May 30, CPS took J.W.M. to an Amarillo psychiatrist.  After the appointment J.W.M. became very upset and the psychiatrist made arrangements for his admission to an Amarillo psychiatric hospital.  J.W.M. ran from the hospital admissions area but was

4

located by police later that day. J.W.M. resisted the officers' attempt to return him to the hospital. During the episode, J.W.M. slipped from leg restraints in a police car and attempted to kick out a rear window of the vehicle. On reaching the hospital, an officer suffered a back injury while struggling to move J.W.M. from the vehicle into the facility. CPS was not able to obtain commitment of J.W.M. to the hospital and he was released again to the agency's care. By making a child-specific contract with Texas Hill Country, a treatment center, CPS was able to place J.W.M. in that facility.

At the disposition hearing, Steven Nelson testified he had been J.W.M.'s CPS caseworker for three or four weeks. When asked of the program at Texas Hill Country, Nelson explained the facility primarily treats victims of head trauma. According to Nelson, at the time of the hearing J.W.M. had been at Texas Hill Country three weeks and "so far, no problems." Nelson had no disposition recommendation, nor did Sampson as she had little contact with J.W.M. since September 2006.

In hearing testimony, J.W.M.'s mother agreed her son historically exhibits acceptable behavior initially after placement or return to his home before reverting to inappropriate behavior. CPS supervisor Tiffany Hill opined that the program at Texas Hill Country was not sufficient for meeting the long-range treatment needs of J.W.M. She believed J.W.M. had psychological issues Texas Hill Country was not capable of treating. Hill recommended "some type of boot camp, TYC." According to Casey Litherland, a worker in CPS's managing conservatorship program, because CPS had exhausted all placement possibilities and because of J.W.M.'s poor placement history, commitment to TYC was recommended.

5

After the close of evidence at the disposition hearing the court ordered J.W.M. committed to TYC for an indeterminate period. J.W.M. filed a motion for new trial which was apparently overruled by operation of law. *See* Tex. R. Civ. P. 329b(c). He timely filed a notice of appeal.

## Issues

Through two issues, J.W.M. challenges the legal and factual sufficiency of the evidence supporting the court's finding that in his home J.W.M. "cannot be provided the quality of care and level of support and supervision that [he] needs to meet the conditions of probation."

## Discussion

Once the court adjudges that a juvenile engaged in delinquent conduct, it possesses broad discretion in reaching a disposition. *In re C.J.H.,* 79 S.W.3d 698, 702 (Tex.App.–Fort Worth 2002, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex. 1985). There is no abuse, however, simply because a trial court decided an issue within its discretion differently than would the reviewing appellate court. *Id.* at 242.

Under the abuse of discretion standard, the legal and factual sufficiency of the evidence are not independent grounds of error, but are relevant factors for determining

whether the trial court abused its discretion.[2]  *See Beaumont Bank, N.A. v. Buller,* 806 S.W.2d 223, 226 (Tex. 1991); *In re C.J.H.,* 79 S.W.3d at 702 n.10; *In re J.R.C.,* 236, S.W.3d 870, 875 (Tex.App.–Texarkana 2007, no pet.) (modification of disposition under Tex. Fam. Code Ann. § 54.05 (Vernon Supp. 2007)).  When appeal is taken from a bench trial the court's findings of fact "have the same force and dignity as a jury's verdict upon questions."  *Anderson v. City of Seven Points,* 806 S.W.2d 791, 794 (Tex. 1991).  In determining whether the evidence is sufficient to support the disposition ordered, we apply a civil standard of review.  *In re J.P.R.,* 95 S.W.3d 729, 731 (Tex.App.–Amarillo 2003, no pet.).

An appellant attacking the legal sufficiency of an adverse finding on an issue on which he did not have the burden of proof must demonstrate there is no evidence supporting the adverse finding.  *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex. 1983).  We sustain a no evidence challenge when "'(a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.'"  *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex. 2003) (*quoting Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex. 1997)).

---

[2] *But see In re K.T.,* 107 S.W.3d 65 (Tex.App.–San Antonio 2003, no pet.) (en banc).  In *In re K.T.*, the court reviewed a TYC commitment order under an abuse of discretion standard divorced of legal and factual review standards. *Id.* at 67, 72-74. Thus the court "'deferred to the trial court's findings of historical fact but determined de novo whether'" the disposition was appropriate. *Id.* at 73 (*quoting In re R.J.H.,* 79 S.W.3d 1, 6-7 (Tex. 2002)).

We determine the legal sufficiency of the evidence by finding whether the evidence would enable reasonable and fair-minded jurors to reach the verdict under review. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005). In conducting the review, we consider all of the evidence, giving deference to evidence favorable to the verdict if reasonable and fair-minded jurors could and disregarding evidence contrary or unfavorable to the verdict unless reasonable and fair-minded jurors could not. *Id.*

When we review a factual sufficiency challenge of a finding on an issue as to which the appellant did not have the burden of proof, we consider and weigh all of the evidence, both supporting and contrary to the judgment, and set aside the judgment only if the evidence supporting the challenged finding is so weak that the finding is clearly wrong and manifestly unjust. *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.,* 766 S.W.2d 264, 276 (Tex.App.–Amarillo 1988, writ denied) (*citing Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965)); *see Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex. 2001). The fact finder is the exclusive judge of the credibility of witnesses and the weight given their testimony. *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex. 2003).

The Family Code prohibits a disposition under section 54.04 unless the child is in need of rehabilitation or the protection of the public or the child requires a disposition. Tex. Fam. Code Ann. § 54.04(c) (Vernon Supp. 2007). Commitment of a juvenile to TYC requires the court find and express in its disposition order that: (A) it is in the child's best interests to be placed outside his home, (B) reasonable efforts were made to prevent or eliminate the need for his removal from the home and to make it possible for the child to

8

return to his home, and (C) the child cannot be provided the quality of care and level of support and supervision in his home that he needs to meet the conditions of probation. Tex. Fam. Code Ann. § 54.04(i)(1)(A)-(C) (Vernon Supp. 2007). Here, the juvenile court made these findings in its disposition order.

J.W.M. argues that because at the time of the disposition hearing he was under the temporary managing conservatorship of CPS the State stood *in loco parentis.* He then reasons that his "home," as that term is used in section 54.04(i)(1)(C), was Texas Hill Country where his "parent," the State of Texas, placed him. Thus, according to J.W.M., because during his three-week stay at Texas Hill Country his behavior was acceptable the evidence was legally and factually insufficient to prove the level of care, support and supervision received in his "home" were inadequate for probation. We find this argument without merit.

We have detailed the evidence of J.W.M.'s then five-year involvement with the juvenile justice system. The evidence depicts a progressive effort by juvenile probation officials and the juvenile court, working with treatment centers, a placement facility, mental health workers and social workers, to assist J.W.M. while balancing the punitive and rehabilitative components of the Juvenile Justice Code.[3] When juvenile authorities and

---

[3] The Juvenile Justice Code, adopted as Title 3 of the Family Code in 1995, was a response to growing social concern with the severity of juvenile crime and numerosity of offenders. *See* Act of May 31, 1995, 74th Leg., R.S., ch. 262, § 14, 1995 Tex. Gen. Laws 2517, 2524, 2646. The code evidences a legislative movement "away from the traditional rehabilitation model for treatment toward accountability and punishment." *In re J.B.M.,* 157 S.W.3d 823, 828 (Tex.App.–Fort Worth 2005, no pet.) (Gardner, J., concurring); *see* Tex. Fam. Code Ann. § 51.01 (Vernon 2002) (purpose of Title 3).

9

J.W.M.'s mother exhausted possibilities of placement and care at home, CPS was appointed temporary managing conservator of J.W.M. But even that agency could not provide a placement from which J.W.M. did not run or cause disruption. While the three-week period between the placement of J.W.M. at Texas Hill Country and the disposition hearing did not produce a report in evidence of antisocial behavior or unlawful conduct, this is not inconsistent with the hearing testimony that historically following an initial period of good behavior in a new environment J.W.M. reverts to inappropriate or unlawful behavior. Moreover, CPS supervisor Tiffany Hill did not believe Texas Hill Country could serve J.W.M.'s long-term needs as he presented psychological problems the facility could not treat. The evidence further showed no other placement for J.W.M. was available to CPS or juvenile authorities. CPS worker Casey Litherland believed because CPS had exhausted all placement options and J.W.M. would likely not succeed in placement at Texas Hill Country, commitment to TYC was necessary.

Because the court heard uncontroverted testimony that J.W.M. engaged in unlawful conduct before and after CPS assumed temporary managing conservatorship and Texas Hill Country was not suitable for meeting J.W.M.'s long-term treatment needs, it is unnecessary for us to decide whether his "home," for the purpose of section 54.05(i)(1)(C), was his family home or in the care of CPS. In either case, the evidence was legally and factually sufficient to support the court's finding that the home of J.W.M. did not provide him the statutorily specified resources for meeting the conditions of a probation order. J.W.M. has not demonstrated the juvenile court abused its discretion by committing him to TYC. We overrule J.W.M.'s first and second issues.

10

Conclusion

Having overruled the two issues J.W.M. presents, we affirm the judgment of the trial court.


James T. Campbell
Justice

11